**GATX LEASING CORPORATION,**
Plaintiff–Appellant,

v.

**NATIONAL UNION FIRE INSURANCE COMPANY, Defendant–Appellee.**

No. 94–3562.

United States Court of Appeals,
Seventh Circuit.

Argued March 30, 1995.

Decided Sept. 8, 1995.

Steven H. Mora (argued), Diana M. Paserba, Mora & Baugh, Ltd., Chicago, IL, for plaintiff-appellant.

Sandra Young (argued), Howard J. Fishman, Purcell & Wardrope, Chicago, IL, for defendant-appellee.

Before FLAUM, RIPPLE and ROVNER, Circuit Judges.

RIPPLE, Circuit Judge.

GATX was sued by TCR and Arco under various theories of liability for damages related to the loss of petroleum stored by TCR and Arco in a GATX facility. In dealing with this suit, GATX incurred significant attorneys' fees and settlement costs. Consequently, GATX filed a declaratory judgment action against Nation Union Fire Insurance Company, alleging that National Union had a duty to defend and to indemnify GATX under both a general liability policy and a related umbrella policy. The district court granted judgment on the pleadings to National Union. For the reasons contained herein, we affirm.

# I

# BACKGROUND

## A. *Facts*

Amarco Petroleum, Inc. ("Amarco") operated a petroleum product terminal storage and transfer facility near Houston, Texas. GATX was a secured creditor of Amarco, and had leased separately virtually all of the plant assets at the facility to Amarco. In November 1983, GATX filed an involuntary petition in bankruptcy against Amarco. GATX terminated the equipment lease prior to the filing of the bankruptcy petition and assumed possession of the facility assets.

Two customers of the facility, Arco Chemical Company ("Arco") and Texas City Refining ("TCR"), considered not renewing their agreement because of Amarco's apparent insolvency. Around that time, officers of GATX conferred with Arco and TCR regarding a continuing agreement. GATX wanted the facility operations to continue in order to protect the value of the facility assets, as well as to maintain the revenue derived from the facility's use. To that end, GATX acquired the exclusive use of the name "Amarco Petroleum, Inc." to ensure continuity of business. Further, GATX assured Arco and TCR that, if they continued to use the facility and renewed their petroleum products storage agreements, GATX would be responsible for facility operations. Arco and TCR renewed their storage agreements on the assurances that GATX would be responsible for the continuing control and operation of the facilities.

In June 1985, Arco and TCR discovered that vast quantities of their stored products were missing, and TCR found that further quantities of its fuel had been degraded by the unauthorized addition of foreign chemical substances. This discovery was not made until 1985, Arco and TCR submit, because GATX and its employees had, both orally and in writing, represented that their inventories were consistent with the quantities of product originally delivered for storage, and had conspired to hide the thefts of the product.

Following the discovery of the missing petroleum products, Arco filed claims, and TCR intervened, against GATX and several GATX

entities,[1] among others, alleging breach of contract, breach of guarantee, negligence, fraudulent inducement and misrepresentation, and conversion. GATX requested that National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union") defend and indemnify it with respect to the lawsuits, but National Union declined. Eventually, GATX settled with Arco for the sum of approximately $300,000, and with TCR for $500,000. GATX estimated that its defense costs, including attorneys' fees, that led up to the settlement totalled $450,000.

On January 24, 1994, GATX filed a declaratory judgment action against National Union, contending that National Union had a duty to defend and to indemnify GATX for the Arco and TCR legal actions under two policies issued to Amarco, effective June 14, 1984: the Primary Policy, No. EHA 940–9398 RA, and the Umbrella Policy No. EHA 940–9399. These policies stated that National Union, on behalf of Amarco or any other insured, would recompense all amounts to which Amarco or any insured became legally obligated due to "property damage" caused by an "occurrence." Because GATX had leased equipment to Amarco which comprised the "principal facilities," GATX was named as an additional "person insured" under the primary policy.

### B. District Court Proceedings

National Union moved for judgment on the pleadings. *See* Fed.R.Civ.P. 12(c).[2] The district court granted the motion. The court first determined that Texas substantive law applied. The court then held that, under the terms of the insurance agreements, GATX could not allege any "property damage" caused by an "occurrence." Alternatively, the court held that, because the Arco and TCR products had been "entrusted" to the "care, custody and control" of GATX, dam-

age to those products was excluded under the terms of the insurance agreements. *GATX Leasing Corp. v. National Union Fire Ins. Co.*, No. 94 C 431, 1994 WL 383909, at *7 (N.D.Ill. July 19, 1994).

## II

## ANALYSIS

We review de novo judgments on the pleadings under Fed.R.Civ.P. 12(c). *Craigs, Inc. v. General Elec. Capital Corp.*, 12 F.3d 686, 688 (7th Cir.1993); *Fallimento C.Op. M.A. v. Fischer Crane Co.*, 995 F.2d 789, 791 (7th Cir.1993). We review a motion pursuant to Rule 12(c) under the same standard as a motion to dismiss under Fed.R.Civ.P. 12(b). *Thomason v. Nachtrieb*, 888 F.2d 1202, 1204 (7th Cir.1989). "Accordingly, the motion should not be granted unless it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Id.* (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). In evaluating the motion, we will view the facts in the complaint in the light most favorable to the nonmoving party. *Craigs, Inc.*, 12 F.3d at 688.

### 1.

■ We begin, as did the district court, with the choice of law issue. The district court concluded that Texas state law applies to this case. We agree. A federal court sitting in diversity looks to the conflict-of-laws rules in the state jurisdiction in which it sits in order to choose the substantive law applicable to the case. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *S.A. Healy Co. v. Milwaukee Metro. Sewerage Dist.*, 50 F.3d 476, 478 (7th Cir.1995); *Horn v. Transcon Lines, Inc.*, 7 F.3d 1305, 1307 (7th Cir.1993).

---

**1.** Arco sued GATX and its subsidiary, GLC Petroleum services. TCR intervened against the same defendants and two other entities affiliated with GATX: GATX Leasing Corporation and GATX Terminals Corporation. We refer to all the GATX entities collectively as "GATX."

**2.** Fed.R.Civ.P. 12(c) provides:
After the pleadings are closed but within such time as not to delay the trial, any party may

move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

We have recognized, in previous cases, that, in dealing with choice of law issues in the area of contract law, the Illinois Supreme Court applies the Second Restatement's "most significant contacts" test.[3] *See CSX Transp., Inc. v. Chicago & N.W. Transp. Co.*, 62 F.3d 185, 188 (7th Cir.1995); *Wildey v. Springs*, 47 F.3d 1475, 1481 (7th Cir.1995).[4] Under the "most significant contacts" test, the contacts relevant to a choice-of-law decision include "the place of contracting, negotiation, performance, location of the subject matter of the contract, and the domicil[e], residen[ce], place of incorporation, and business of the parties." *Palmer v. Beverly Enters.*, 823 F.2d 1105, 1109–10 (7th Cir.1987) (citations omitted). In the case of fire, surety and casualty insurance contracts, the Restatement, applying these general principles, takes the position that the law of the principal situs of the insured risk ought to be applied. Restatement (Second) of Conflicts § 193 (1971). *Cf. Nationwide Ins. v. Zavalis*, 52 F.3d 689, 693 & n. 4 (7th Cir.1995)

(noting in context of homeowner's policy that place of delivery controls, but also noting that covered home was in that state).[5]

In this case, under the analysis set forth by the Restatement, it is clear that the law of Texas ought to be applied. As the district court noted, both Amarco and GATX were located in Texas, the events at issue occurred in Texas, and the underlying lawsuits were filed in Texas. Illinois had no contacts with the suit other than its being the forum chosen by GATX.[6]

### 2.

We now turn to the general principles of Texas law that must guide our analysis. GATX submits that the theft and contamination of the Arco and TCR petroleum products in storage at the GATX facility was an "occurrence" for purposes of the National Union insurance policy, and that therefore National Union had a duty to defend GATX, the insured.[7] We shall determine whether

---

3. Restatement (Second) of Conflicts § 188 (1971).

4. *See also Lee v. Interstate Fire & Casualty Co.*, 826 F.Supp. 1156, 1159 (N.D.Ill.1993) (discussing dicta in *Hofeld v. Nationwide Life Ins. Co.*, 59 Ill.2d 522, 322 N.E.2d 454 (1975)); *U.S. Gypsum Co. v. Admiral Ins. Co.*, 268 Ill.App.3d 598, 643 N.E.2d 1226 (1994).

5. *Zavalis* relies on *U.S. Fire Ins. Co. v. Beltmann N. Am. Co.*, 883 F.2d 564, 566 (7th Cir.1989), for the proposition that the law of the place of issuance of the insurance policy ought to be applied. But *Beltmann* also notes that the same state was the principal place of business of the insured company. *Beltmann* cites indiscriminately Illinois authority that deals with a variety of insurance contexts. *See Hofeld v. Nationwide Life Ins. Co.*, 59 Ill.2d 522, 322 N.E.2d 454, 458 (1975) (holding group life, health and accident policy construed according to the party choice); *Jadczak v. Modern Serv. Ins. Co.*, 151 Ill.App.3d 589, 104 Ill.Dec. 932, 935, 503 N.E.2d 794, 797 (1987) (holding automobile policy construed according to law of state where issued and delivered or when contract was formed); *Thieme v. Union Labor Life Ins. Co.*, 12 Ill.App.2d 110, 138 N.E.2d 857, 859–60 (1956) (holding group life insurance policy construed according to law of state where delivered and the location of the insured).

6. We note that GATX submitted, in its Motion for Reconsideration filed with the district court, that

*Wood v. Mid–Valley, Inc.*, 942 F.2d 425, 426 (7th Cir.1991), mandates that the court apply Illinois law. We, like the district court, find the case inapposite. *Wood* considered two issues irrelevant to the decision in this case: (1) courts do not automatically enforce choice-of-law stipulations in contracts; and (2) courts may apply the law of the state in which the federal court sits, if neither party raises a conflict-of-law issue in a diversity case. *See Employers Ins. v. Bodi–Wachs Aviation Ins. Agency, Inc.*, 39 F.3d 138, 141 n. 2 (7th Cir.1994).

At trial, National Union raised a choice-of-law issue, and GATX opted not to respond to its arguments, despite "ample opportunity." *See GATX Leasing Corp. v. National Union Fire Ins. Co.*, No. 94 C 431, 1994 WL 529370, at *1 (N.D.Ill. Sept. 27, 1994). GATX's failure to address the choice-of-law issues during trial can be considered a waiver. *See Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*, 971 F.2d 1332, 1336 (7th Cir.1992) (considering appeal in underlying litigation and stating that claims that could have been raised prior to judgment may not be raised for the first time in Rule 59(e) motion).

7. National Union's duty to defend is also contingent on whether the theft, conversion, and adulteration of the petroleum products is classified as "property damage" under the terms of the primary and umbrella insurance policies. The district court held that the theft or conversion is not, while the contamination of TCR's petroleum was. *GATX Leasing Corp. v. National Union Fire Ins. Co.*, No. 94 C 431, 1994 WL 383909, at *4

National Union had a duty to defend by considering the allegations of the complaint "in the light of the policy provisions without reference to the truth or falsity of such allegations." *Argonaut Southwest Ins. Co. v. Maupin*, 500 S.W.2d 633, 635 (Tex.1973). We look to the face of the pleadings without reference to outside facts to make this determination, *Houston Petroleum Co. v. Highlands Ins. Co.*, 830 S.W.2d 153, 155 (Tex.Ct. App.1990), and our decision regarding the duty to defend will not be influenced by facts learned before the suit, in the process of the litigation, or by the ultimate outcome of the underlying litigations. *American Alliance Ins. Co. v. Frito–Lay, Inc.*, 788 S.W.2d 152, 154 (Tex.Ct.App.1990). "If the third party [Arco and TCR] only alleges facts that, even if true, are excluded by the [insurance] policy, the insurer does not have a duty to defend regardless of the legal theories involved in the case." *Maryland Casualty Co. v. Texas Commerce Bancshares, Inc.*, 878 F.Supp. 939, 942 (N.D.Tex.1995) (citing *Fidelity & Guar. Ins. Underwriters, Inc. v. McManus*, 633 S.W.2d 787, 788 (Tex.1982)). If GATX has failed to allege a factual paradigm in its complaint that would support a theory of recovery within the ambit of the National Union policy provisions, we must affirm the decision of the district court. *See Continental Sav. Ass'n v. United States Fidelity & Guar. Co.*, 762 F.2d 1239, 1243 (5th Cir.) ("The duty [to defend] arises when a third party sues the insured on allegations that, if taken as true, potentially state a cause of action within the terms of the policy."), *amended on other grounds*, 768 F.2d 89 (5th Cir.1985).

■ As a general rule, under Texas law, insurance contracts are interpreted under the same rules of construction as standard contracts. *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex.1987). However, if the insurance policy is susceptible to more than one reasonable interpretation, any ambiguity will be resolved by adopting a con-

struction that favors the insured. *National Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 554 (Tex.1991); *Ramsay v. Maryland Am. Gen. Ins. Co.*, 533 S.W.2d 344, 349 (Tex.1976). "Not every difference in the interpretation of an insurance policy amounts to an ambiguity," however. *Maryland Casualty Co.*, 878 F.Supp. at 941. Although the insured and insurer likely may take conflicting views of coverage, neither conflicting expectations nor dialectics are sufficient to create an ambiguity. *Id.* (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex.1994)).

### 3.

■ With the principles of Texas law that we have just set forth in mind, we now turn to the facts of the case before us. We first examine the pertinent insurance policies. The primary policy defined an "occurrence" as:

> [A]n accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured[.]

R.1–1, Ex.A. In the umbrella policy, the term "occurrence" is defined as:

> [A]n event, including continuous or repeated exposure to conditions, which result in Personal Injury or Property Damage during the policy period, neither expected nor intended from the standpoint of the insured[.]

*Id.*

An examination of the pleadings in the underlying litigation makes clear that the plaintiffs in that case sought recovery against GATX for theft, conversion, and contamination of petroleum products. We also note that, in this appeal, GATX does not ask us to review the analysis of the district court regarding whether the petroleum loss and contamination represents "property damage" under the terms of the insurance policies.[8]

---

(N.D.Ill. July 19, 1994); *see* Appellant's Br. at 10 n. 3. We need not consider this issue on review because we conclude that GATX did not allege an "occurrence" under the terms of the insurance policies. *See GATX*, No. 94 C 431, 1994 WL 383909, at *3 (listing cases).

**8.** Under both the Primary and Umbrella Policies, "property damage" is defined as:

> (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom; or (2) loss of use of tangi-

Our task on review is to determine solely whether the facts, as alleged in the underlying complaint, can be characterized as an "occurrence" that triggers National Union's duty to defend GATX.

Our review of the relevant case law makes clear that, when harm to property is caused by the intentional act of one party, it cannot be characterized as "accidental" or an "event" causing an "occurrence" under an insurance policy. This result is correct even if the insured allowed the intentional act only through its negligence.[9] This basic principle recognizes the reality that the risk of accidental loss or damage to property is fundamentally different from the risk of loss from intentional acts of the insured.[10] Texas has recognized this fundamental distinction. It has also made clear that, when the volitional act of the insured is predicated on an act of negligence, the principle remains intact. In *Argonaut Southwest Ins. Co. v. Maupin*, 500 S.W.2d 633 (Tex.1973), the Supreme Court of Texas held that an insurer was not required to defend an insured under terms of a policy that provided for the defense of the insured against claims arising out of an "accident."[11] In *Maupin*, the insured removed "borrow material" from property after receiving per-

mission for removal from the current tenant. The actual property owner sued the insured on theory of trespass. The court stated that, even though it could be argued that the insured did not intend to injure the property owner, the damage that occurred resulted from the intentional removal of "borrow material." *Id.* at 635. The court noted that:

> Where acts are voluntary and intentional and the injury is the natural result of the act, the result was not caused by accident even though that result may have been unexpected, unforeseen and unintended. There was no insurance against liability for damages caused by mistake or error. The cause of the injury was not an accident within the meaning of this policy.

*Id.* (quoting *Thomason v. United States Fidelity & Guar. Co.*, 248 F.2d 417 (5th Cir. 1957)). Thus, the Supreme Court of Texas, in considering an insurance policy very similar to the policy at issue here, concluded, in essence, that despite the negligence of the insured, who was unaware of the true owner of the property from which material was taken, the ensuing damage was not an event that could be characterized as an "occur-

---

ble property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

R. 1–1, Ex.A. *See also* note 6, *supra.*

**9.** The district court correctly noted that, "[a]lthough the two policies contain somewhat different language, the differences are not material. GATX attempts to distinguish the 'accident' language in the Primary Policy from the 'event' language in the Umbrella Policy. Whether 'occurrence' is defined specifically to include an 'accident' or not, an 'occurrence' must still be accidental." *GATX Leasing Corp.*, No. 94 C 431, 1994 WL 383909, at *5.

> A leading treatise defines "accident" as:
> an unusual or unexpected event, happening without negligence; chance or contingency; happening by chance or unexpectedly; an event from an unknown cause or an unexpected event from a known cause.

11 *Couch on Insurance* § 44:288 at 443 (2d ed. 1982). Such language indicates that the substitution of "event" for "accident" is irrelevant. Further support is also found in the fact that since 1940, the insurance industry has used a standard general liability policy. This standard policy, the Comprehensive General Liability Policy, was most recently modified in 1972 so that

"occurrence" now means "an accident, including continuous or repeated exposure to conditions, which result in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *See* John A. Appelman, 7A *Insurance Law and Practice* ¶ 4491 at 3, ¶ 4492 at 15 (Rev. ed. 1979); *see also Jasper v. Employers Ins. of Wausau*, 987 F.2d 453, 454 n. 1 (7th Cir.1993). The standard liability policy language is sufficiently close to the language contained in the umbrella policy that we believe that there exists no real difference in meaning between the two.

**10.** This fundamental distinction is widely accepted by the states of the Union. *See Red Ball Leasing, Inc. v. Hartford Accident & Indem. Co.*, 915 F.2d 306, 309 n. 1 (7th Cir.1990) (collecting cases).

**11.** In relevant part, the provisions of the insurance policy at issue in *Maupin*:

> The word 'occurrence' as used herein shall mean either (a) an accident, or (b) in the absence of an accident, a condition for which the insured is responsible which during the policy period causes physical injury to or destruction of property which was not intended. 500 S.W.2d at 634 n. 1.

rence" for purposes of invoking the policy's duty to defend.

In *Red Ball Leasing, Inc. v. Hartford Accident & Indem. Co.*, 915 F.2d 306, 309–10 (7th Cir.1990), in the course of interpreting Indiana law, we looked for support to the Texas decision and held that an insured's deliberate and contemplated act of repossessing trucks did not become an "accident" under the relevant insurance policy simply because the insured's negligence prompted the act.[12] In *Red Ball*, the insured, who was in the business of selling and leasing trucks, improperly repossessed some trucks. We held that such an incident was not an "accident" covered under the relevant casualty policy even though the insured mistakenly believed it had a right to repossess the trucks because its accounting system erroneously indicated that the buyer had defaulted on payments. The crux of our analysis relied on the fact that the insured's decision to repossess the trucks was intentional. We concluded:

> A volitional act does not become an accident simply because the insured's negligence prompted the act. Injury that is caused by negligence must be distinguished from injury that is caused by a deliberate and contemplated act initiated at least in part by the actor's negligence at some earlier point. The former injury may be an accident.... However, the latter injury, because it is intended and the negligence is attenuated from the volitional act, is not an accident.

*Id.* at 311. If the damage at issue resulted from a volitional act, we have held that such a situation does not constitute an "occurrence" for purposes of insurance policy interpretation. *See id.* at 309–11 & nn. 1–4 (collecting cases); *see also Jasper v. Employers Ins. of Wausau*, 987 F.2d 453, 456–59 (7th Cir.1993) (holding in context of duty to defend insurance provision that a city's error in issuing building permits and fact that ensuing property damage could have been avoided did not transform the city's intended act into an occurrence for purposes of coverage).

The plaintiffs in the underlying action included in their complaint an allegation that GATX had supervised its personnel in a negligent manner and therefore permitted the theft. The district court therefore examined several cases[13] that, in the view of GATX, require that National Union defend it on this claim and therefore on the entire action. We note initially that these cases cannot be considered controlling. None are based on the law of Texas; as we determined earlier, Texas law must be applied to substantive issues in this case. This court, as was the district court, is obligated to construe the law as it would expect the Supreme Court of Texas to do.[14] In *Duncanville Diagnostic Ctr., Inc. v. Atlantic Lloyd's Ins. Co.*, 875 S.W.2d 788, 792 (Tex.Ct.App.1994), a Texas intermediate appellate court held that an allegation that the death of child was due to the "negligent hiring, training, and supervision and negligent failure to establish adequate policies and procedures" was not independent and mutually exclusive from the "negligent rendering of professional medical treatment."

12. The policy at issue in *Red Ball* defined an "occurrence" as:

> an accident, including continuous or repeated exposure to conditions, which results in ... property damage neither expected nor intended from the standpoint of the insured.

*Red Ball*, 915 F.2d at 307–08 (emphasis removed).

13. *United States Fidelity & Guar. Co. v. Open Sesame Child Care Ctr.*, 819 F.Supp. 756, 758–61 (N.D.Ill.1993) (holding that insurer had duty to defend claim of negligent hiring of employee who sexually harassed a minor); *International Amphitheatre Co. v. Vanguard Underwriters Ins. Co.*, 177 Ill.App.3d 555, 126 Ill.Dec. 808, 811–13, 532 N.E.2d 493, 496–98 (1988) (holding duty to defend existed when a theater was sued for failing negligently to maintain premises where attacks and sexual abuse of spectators took place, although not considering specifically whether an "occurrence" existed); *State Sec. Ins. Co. v. Globe Auto Recycling Corp.*, 141 Ill.App.3d 133, 95 Ill.Dec. 539, 541, 490 N.E.2d 12, 14 (1986) (holding that the negligent hiring by insured of employee who committed an intentional tort "potentially [was] within" a policy similar to the one at issue).

14. *Cf. Rose v. Franchetti*, 979 F.2d 81, 85 (7th Cir.1992) (holding court should predict what Supreme Court of state would do, and stating that "intermediate state courts offer the best guidance in this enterprise ... unless we have solid reason to believe that the state's highest court would repudiate them").

Therefore, a professional services exclusion in the policy was operative. Other federal courts, also obliged to discern the course that the Supreme Court of Texas would follow, have concluded that a claim such as the one before us would not be considered independent, but rather interdependent, of the claim of intentional misconduct. In *Old Republic Ins. Co. v. Comprehensive Health Care Assocs., Inc.*, 786 F.Supp. 629 (N.D.Tex.1992), *aff'd*, 2 F.3d 105 (5th Cir.1993), former employees brought suit against their employer and its employee alleging sexual harassment, discrimination, and negligent hiring. The court, considering a declaratory judgment action involving a duty to defend, cited the Texas Supreme Court case *Maupin* favorably and held that the employee allegations did not constitute an "occurrence." The court stated:

> [T]he Court is not persuaded by the argument that the allegations are severable and, therefore, insurers owe a separate and distinct duty to defend [the employer]. To the contrary, each and every allegation arises out of the alleged acts of sexual harassment. Finding a separate and distinct duty to defend [the employer] would necessarily require proof of the underlying sexual harassment. The allegations are not mutually exclusive; rather they are related and interdependent. Without the underlying sexual harassment there would have been no injury and obviously, no basis for a suit against [the employer] for negligence.

*Id.* at 633.

Similar reasoning was employed by the Fifth Circuit in *Columbia Mut. Ins. Co. v. Fiesta Mart, Inc.*, 987 F.2d 1124 (5th Cir.

1993). In *Fiesta Mart,* the court held that the insurer did not owe a duty to defend an insured in an underlying suit based on a theory of negligence because the insured's negligence was related to, interdependent on, and inseparable from, the intentional fraudulent activity of a financial corporation to which the insured leased "vendor locations." The court stated that, without the volitional fraudulent act of the financial corporation, which the insured had allowed to conduct business on its premises, there would have been no basis for suit against the insured.[15]

GATX's complaint presents no factual basis that can be characterized as an "occurrence" to invoke National Union's duty to defend. The loss and damage to the petroleum products alleged by TCR and Arco resulted from volitional acts of employees of the storage facility. As such, given the relevant Texas law, we cannot, as a matter of law, separate the negligent act of GATX from the intentional acts of the storage facility employees for purposes of construing the relevant insurance provisions. Accordingly, we affirm the district court's conclusion that, as a matter of Texas law, GATX "cannot establish that TCR and Arco sued for 'property damage' that was caused by an 'occurrence.' " *GATX Leasing Corp.,* No. 94 C 431, 1994 WL 383909, at *7.[16]

### Conclusion

For the foregoing reasons, judgment on the pleadings for National Union is affirmed.

AFFIRMED.

---

15. We have examined the other state authorities that GATX claims conflict with our analysis. *See Kulubis v. Texas Farm Bureau Underwriters Ins. Co.,* 706 S.W.2d 953 (Tex.1986); *Republic Nat'l Life Ins. Co. v. Heyward,* 568 S.W.2d 879 (Tex. Civ.App.1978); *Walker v. Lumbermens Mut. Casualty Co.,* 491 S.W.2d 696 (Tex.Civ.App.1973). None of these cases is on point or casts significant suspicion on our analysis to warrant extended discussion.

16. GATX also submits that the district court erred by holding, on an independent, alternative ground, that the petroleum products at issue were in the "care, custody or control" of GATX

at the time of their loss or contamination, thus falling under the insurance policy provisions that exempt such products from coverage. We need not consider this contention because we already have determined that the theft and contamination of the petroleum products does not constitute an "occurrence," thus precluding coverage no matter what the resolution of this issue. Likewise, GATX's argument that National Union had a duty to investigate independently the underlying litigation allegations in order to determine whether it had a duty to defend GATX on the basis of the "care, custody or control" issue has no merit.