**NBD BANK, an Illinois banking corporation, Plaintiff and Counter-defendant,**

v.

**STANDARD BANK AND TRUST COMPANY, an Illinois banking corporation, Defendant and Counter-plaintiff.**

No. 93 C 7234.

United States District Court, N.D. Illinois, Eastern Division.

Jan. 15, 1997.

See also 79 F.3d 37.

Creighton Roland Meland, Jr., Robert P. Hurlbert, Daniel J. Sheridan, Dickinson, Wright, Moon, Van Dusen & Freeman, Chicago, IL, for NBD Bank.

James B. Carroll, James B. Carroll & Associates, Evergreen Park, IL, Richard M. Franklin, Thomas F. Bridgman, Baker & McKenzie, Chicago, IL, for Standard Bank and Trust Co.

## MEMORANDUM OPINION AND ORDER

GOTTSCHALL, District Judge.

This matter is before the court on the motion for judgment on the pleadings of defendant Standard Bank and Trust Company ("Standard"). For the reasons set forth below, the motion is denied.

## BACKGROUND

This action arises out of a check kiting scheme allegedly first discovered by plaintiff NBD Bank ("NBD"). NBD alleges that on Thursday, November 18, 1993, the individual behind the check kiting scheme ("the perpetrator") presented for deposit into customer accounts at NBD checks in the aggregate amount of $3,997,406.75 drawn on various customer accounts maintained at Standard.

First Amended Complaint for Declaratory Judgment and Other Relief ("Cmplt."), ¶ 10. On Friday, November 19, 1993, by 8:00 a.m., NBD caused these checks to be presented to Standard. La Salle National Bank ("La Salle"), in its capacity as collecting bank, charged Standard's account and provisionally credited NBD with these amounts. Cmplt., ¶ 11; First Amended Counterclaims ("Cntrclm."), ¶ 8.

On the same day as did NBD, Standard also transacted business with the perpetrator or a related individual. Thus, on Thursday, November 18, 1993, the perpetrator caused to be presented to Standard for deposit into customer accounts at Standard checks in the aggregate amount of $4,025,000 drawn on customer accounts maintained at NBD. Cmplt., ¶ 8. On Friday, November 19, 1993, Standard caused the checks to be presented to NBD for payment. La Salle, in its capacity as collecting bank, charged NBD and provisionally credited Standard with the amount of the checks. Cmplt., ¶ 9; Cntrclm., ¶ 9.

■ NBD alleges that on Monday, November 22, 1993, NBD discovered that the perpetrator had been signing all or almost all the checks drawn on the NBD customer accounts in question, and that those accounts showed repeated large transfers of funds indicative of a potential check kiting scheme. NBD therefore caused the checks to be stamped "Return to Maker" and did not honor them. It is undisputed that NBD caused the checks to be returned to Standard on that same Monday, November 22, 1993. Cmplt., ¶ 9. As NBD interprets applicable law, return of the checks came before the midnight deadline for that transaction under Article 4 of the Uniform Commercial Code ("UCC"), 810 ILCS 5/4–302.[1]

---

1. Section 4–302 of the Illinois Uniform Commercial Code provides in relevant part as follows:

   Sec. 4–302. Payor bank's responsibility for late return of item. (a) If an item is presented to and received by a payor bank, the bank is accountable for the amount of:

   (1) a demand item, other than a documentary draft, whether properly payable or not, if the bank ... does not pay or return the item or

   send notice of dishonor until after its midnight deadline.

   \* \* \* \* \* \*

   (b) The liability of a payor bank to pay an item pursuant to subsection (a) is subject to defenses based on breach of a presentment warranty (Section 4–208 [810 ILCS 5/4–208]) or proof that the person seeking enforcement of the liability presented or transferred the item for the purpose of defrauding the payor bank.

The central issue in this suit is whether Standard may dishonor the set of checks drawn on its customer accounts that were used in the kiting scheme. Significantly, Standard did not return the checks drawn on the Standard accounts by midnight on Monday, November 22, 1993. Cmplt., ¶ 12. According to Standard, its first notice of the check kiting scheme came at approximately 8:12 a.m. on Tuesday, November 23, 1993, when it received NBD's notice of non-payment of checks in the aggregate amount of $4,025,000 drawn on deposit accounts at NBD. Cntrclm., ¶ 10. That same day, Standard sent three of its officers to NBD's operations processing center, where the officers returned or attempted to return checks drawn on Standard in the aggregate amount of $3,785,441.35. The Standard officers did so at or before 3:58 p.m. Central Standard Time on Tuesday, November 22, 1993. Cmplt., ¶ 13; Cntrclm., ¶ 11.

NBD states that it took the documentation presented, but made no payment or agreement to pay Standard the amount of the checks brought by the officers. The following day, on Wednesday, November 24, 1993, NBD returned the disputed items to Standard, contemporaneously notifying Standard that, because Standard had failed to act by the midnight deadline under UCC § 4–302, NBD was returning the items. Cmplt., ¶ 14; Cntrclm., ¶ 13. The checks having been presented to Standard on Friday, November 19, NBD contends that the midnight deadline for return was midnight on Monday, November 22.

Standard, for its part, maintains that because its officers properly and timely returned checks in the aggregate amount of $3,785,441.35 on Tuesday, November 23, 1993, NBD was required to pay Standard such amount prior to the close of business on that same day, Cntrclm., ¶ 14. As the basis for its argument, Standard looks to Federal Reserve Regulation CC ("Regulation CC"),

which implements the Expedited Funds Availability Act, 12 U.S.C. § 4001 *et seq.*

Section 229.30(a)(1)(i) of Regulation CC, dealing with a paying bank's [2] responsibility for return of checks, provides as follows:

(a) *Return of checks.* If a paying bank determines not to pay a check, it shall return the check in an expeditious manner . . .

(1) *Two-day/four-day test.* A paying bank returns a check in an expeditious manner if it sends the returned check in a manner such that the check would normally be received by the depository bank not later than 4:00 p.m. (local time of the depository bank) of—

(i) The second business day following the banking day on which the check was presented to the paying bank, if the paying bank is located in the same check processing region as the depository bank.

12 C.F.R. § 229.30(a)(1)(i). Since Standard's officers arrived at NBD before 4:00 p.m. of the second business day after the disputed checks were presented to it, Standard would characterize its return of the checks as "expeditious." Consequently, Standard argues that, just as did NBD, it should be able to dishonor the checks drawn upon it that were used in the kiting scheme.

NBD disagrees that compliance with Regulation CC § 229.30(a) is dispositive of the question before the court. NBD maintains that § 229.30(a) does not extend the deadline for returning checks under the UCC. Rather, NBD interprets the regulation as creating an independent duty to achieve expeditious return of checks. According to NBD, the duty under § 229.30(a) is additional to and separate from the obligation to comply with the deadline under the UCC for returning dishonored checks. As NBD notes, official commentary to Regulation CC states that, except for the extension permitted under § 229.30(c), a paying bank is not relieved

---

810 ILCS 5/4–302. Where a payor bank intends to return a check presented to it, the "midnight deadline" in the process is midnight of the next banking day following receipt of the checks. *First Nat'l Bank in Harvey v. Colonial Bank,* 898 F.Supp. 1220, 1226 (N.D.Ill.1995) (citing UCC §§ 4–301(a) and 4–104(a)(10)).

**2.** With regard to the checks at issue here, Standard would be "the paying bank" and NBD would be "the depository bank."

"from the requirement for timely return (i.e., midnight deadline) under U.C.C. 4–301 and 4–302, which continue to apply." 12 C.F.R., Pt. 229, App. E, § XVI(A)(9)(a).

Confronting the question whether the UCC's midnight deadline would make return of the disputed checks untimely, Standard looks to the following language in § 229.30(c) of Regulation CC:

(c) *Extension of deadline.* The deadline for return or notice of nonpayment under the U.C.C., Regulation J (12 CFR part 210), or § 229.36(f)(2) of the part is extended:

(1) If a paying bank, in an effort to expedite delivery of a returned check to a bank, uses a means of delivery that would ordinarily result in the returned check being received by the bank to which it is sent on or before the receiving bank's next banking day following the otherwise applicable deadline; this deadline is extended further if a paying bank uses a highly expeditious means of transportation, even if this means of transportation would ordinarily result in delivery after the receiving bank's next banking day.

12 C.F.R. § 229.30(c). Since delivery by Standard's officers would be expeditious in the sense that it would ensure that delivery to NBD was in fact made, Standard would excuse the fact that checks were not returned via normal banking channels (apparently through the Federal Reserve Bank) before midnight on Monday, November 22, 1993. NBD on the other hand, argues that the exception under § 229.30(c) applies only if an expedited means of delivery is used on a regular and systematic basis.

The decision to be made here takes into account the procedural posture of this case and the current state of the law under Regulation CC.

In Count I of its counterclaim, Standard seeks a determination that it timely returned checks in the aggregate amount of $3,785,-441.35, and that NBD was required to pay such amount prior to the close of business on Tuesday, November 23, 1993. Were the court to agree, it would follow that NBD's two-count complaint for declaratory judgment must be dismissed. On the other hand, were the court to agree that Standard did not timely dishonor the checks drawn on it, the court would then go on to consider the other counts of Standard's counterclaim. Among the other claims made, Standard asserts defenses raised by payor banks in other check-kiting cases. *See* Henry J. Bailey & Richard B. Hagedorn, *Brady on Bank Checks* ¶¶ 19.11–19.13 (7th ed.1992). Facts relevant to these other issues may be disputed. Perhaps because ruling would not resolve all outstanding issues in any event, NBD has not moved for a judgment in its favor on the two counts of the complaint.

Succinctly stated, the issue to be resolved on this motion is whether, in this check-kiting case, Regulation CC extends the midnight deadline otherwise imposed by UCC § 4–302. As noted in Standard's briefs, at least one commentator would seem to interpret § 229.30 of Regulation CC as allowing the result Standard seeks. *See* James J. White & Robert S. Summers, *Uniform Commercial Code* § 20–5 at 326 (4th ed.1995). On the other hand, another leading commentator has taken the position that the extension under Regulation CC is not intended to allow drawee banks to win kiting cases after missing the midnight deadline under the UCC. Barkley Clark & Barbara Clark, *The Law of Bank Deposits, Collections and Credit Cards* ¶ 6.02[2][1] at 6–65 and ¶ 8.14[2][b] at 8–49 (Rev. ed.1995). Regulators have also noted the existence of disagreement as to whether § 229.30(c) is available to avoid a kite, and requested comment on the issue. Availability of Funds and Collection of Checks, 61 Fed.Reg. 27,802, 27,804 (June 3, 1996). The parties have cited no cases addressing the precise issue presented here.

## DISCUSSION

A motion for judgment on the pleadings under Fed.R.Civ.P. ("Rule") 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6). *Craigs, Inc. v. General Elec. Capital Corp.*, 12 F.3d 686, 688 (7th Cir.1993).[3] Accordingly, the motion is not to be granted unless it appears beyond doubt that the plaintiff can prove no set of facts

---

**3.** If matters outside the pleadings are submitted and not excluded by the court, the Rule 12(c)

that would entitle it to relief. *GATX Leasing Corp. v. National Union Fire Insurance Co.*, 64 F.3d 1112, 1114 (7th Cir.1995). Applying those principles here, Standard's motion is denied.

As stated in the preceding discussion of the parties' arguments, the question presented here is a legal issue on which there appears to be a fair amount of disagreement among experts in the field of banking law. Having reviewed applicable portions of the Official Commentary to Regulation CC, as well as the treatises cited above, it appears that NBD's position represents the majority view on the question presented. Importantly, though, NBD has not sought judgment in its favor, and judgment could not be entered in NBD's favor as long as the factual questions raised by Standard remain unresolved. Because NBD may be able to prove that it is entitled to relief, and because the legal issue presented on this motion is preferably deferred for resolution on a more developed factual record, Standard's motion is denied.

## CONCLUSION

For the reasons set forth above, defendant Standard Bank's motion for judgment on the pleadings is denied.

motion is to be treated as a motion for summary judgment. *Church v. General Motors Corp.*, 74 F.3d 795, 798 (7th Cir.1996). Since the court has not considered the affidavits submitted by NBD, the motion is judged under the same standard as a motion to dismiss.