Sean BRADLEY, Plaintiff,

v.

TNT SKYPACK, INC., a Delaware
corporation, Defendant.

No. 96 C 7494.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 5, 1997.

Donald L. Metzger, Metzger & Associates, Ltd., Chicago, IL, for Plaintiff.

William Francis Dolan, Bell, Boyd & Lloyd, Chicago, IL, Jeffrey W. Pagano, Andrew P. Karamouzis, King, Pagano & Harrison, New York City, for Defendant.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

The plaintiff, Sean Bradley, has sued the defendant, TNT Skypack, Inc. ("TNT") for breach of an employment contract. TNT has filed counterclaims for breach of the employment contract. TNT moves for summary judgment on both Mr. Bradley's claim and its counterclaim. For the following reasons, TNT's motion for summary judgment is granted in part and denied in part.

### Background

In September, 1994, Mr. Bradley was working in Dubai, United Arab Emirates, for TNT Express Worldwide, which, like TNT, is a subsidiary of GD Express Worldwide, N.V., a Netherlands corporation. During September, Mr. Bradley, who wished to secure a position in upper management somewhere within the TNT family of corporations, traveled to New York with the belief a good opportunity for advancement to management positions existed in the United States. Mr. Bradley spent four or five days interviewing with TNT in New York.

Consequently, Mr. Bradley was offered a position as a TNT commercial manager in New York. Mr. Bradley accepted the offer and after some negotiating, in October, 1994, signed a contract for employment. The negotiations occurred between Mr. Bradley and Fil DiNardo, TNT's Human Resources vice president in New York. Mr. Bradley's employment contract provided for certain relocation expenses, housing and car allowances, leave tickets,[1] and set a base pay. The contract also contained a provision explicitly noting Mr. Bradley's interest in career advancement:

> *CAREER OBJECTIVES:* You have clearly indicated that your objective is to eventually secure a senior role in line management. It is understood that this assignment is not a promise that such a position will materialize and that you will be given consideration for such positions along with other internal and/or external qualified candidates. Until such an assignment should materialize, you completely understand that you will work on a project management basis.

(Pl.Ex. A at 21). Mr. Bradley began to make arrangements to move his family from Dubai to the United States. In November, 1994, Tom Cox, the president and CEO of TNT's North American region, sent Mr. DiNardo a memo asking whether it was possible to "get out of the Sean Bradley acquisition?" (Pl. Ex. B at T60). Not long after, Mr. DiNardo called Mr. Bradley and told him he would be offered a sales manager position. Mr. Bradley reminded Mr. DiNardo he was coming to the United States to further his career and would not take a sales manager position. Mr. DiNardo then informed Mr. Bradley he could still have the commercial manager position.

In early December, 1994, Mr. Bradley and his family moved to New York and Mr. Bradley began employment with TNT. Mr. Bradley was provided with temporary housing and a rental car. On January 12, 1995, Roger Corcoran was named president and CEO of the North American region and began a restructuring of TNT. Mr. Bradley was told to stay in temporary housing while the company was restructuring. Mr. Bradley met with Mr. Corcoran and expressed his interest in a senior management position with TNT. In February, 1996, Mr. Corcoran announced the new structure of TNT, which comprised four geographic regions, each headed by a regional vice president who was supported by a regional operations manager and a regional sales manager.

---

1. Leave tickets are airline tickets provided by TNT that allow an employee who is a foreign national to visit his or her home country. The leave ticket provision in Mr. Bradley's contract required that the tickets be used within the first 12 months of employment.

Mr. Bradley was asked to move to Chicago to take the position as regional sales manager of the central region. Mr. Bradley was informed that if he was not interested in that position, the company would find him a position in Europe. Mr. Bradley agreed to move and began reporting to Paul Jasko, the vice president of the central region. The employment contract Mr. Bradley signed for the commercial manager position remained in effect in Mr. Bradley's new position. In mid-March, 1995, Mr. Bradley began work in Chicago. After his move to Chicago, Mr. Bradley requested that TNT provide him with a second disturbance allowance for moving to Chicago, pay the closing costs on a house he bought in Chicago, and provide additional monies Mr. Bradley believed he was owed.

In May, 1995, David Siegfried took over as president and CEO of TNT's North American region. Mr. Siegfried was an ex-Roadway Global Air ("RGA") employee. According to both Mr. Bradley and Mr. Jasko, Mr. Siegfried brought with him former RGA employees to fill senior management positions at TNT. Mr. Bradley was never interviewed for any of the senior management positions that became available.

In September, 1995, TNT again went through a corporate reorganization. The central region was dissolved and incorporated into a new, larger western region. Mr. Bradley was asked to become a Global Accounts Manager, which, according to Mr. Bradley, was a sales position without any management responsibilities. Mr. Bradley inquired as to whether he had been considered for the regional sales manager position for the new western region, but never received a response. Mr. Bradley continued to request his reimbursement and allowance payments.

During December, 1995, and January, 1996, Mr. Bradley started pursuing other career opportunities. Mr. Bradley began negotiating job possibilities in Dubai with DHL Worldwide Express ("DHL"), a company in the same business as TNT. Mr. Bradley's contact at DHL was Ken Pascoe, a DHL manager who Mr. Bradley had known for several years. On January 18, 1996, Mr. Bradley accepted a position to begin work with DHL in Dubai by March 16, 1996. He did not inform TNT that he had accepted the position with DHL. Mr. Bradley scheduled a paid vacation from TNT that commenced on February 10, 1996. At that time Mr. Bradley and his family permanently left the United States. While on paid vacation from TNT, Mr. Bradley began employment with DHL in Dubai.

## Choice of Law

The law that governs a case based on diversity jurisdiction is determined by looking to the conflict-of-law rules of the state in which the federal court sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In breach of contract cases, the Illinois Supreme Court applies the "most significant contacts" test of the Restatement (Second) of Conflicts of Law. *GATX Leasing Corp. v. National Union Fire Ins. Co.*, 64 F.3d 1112, 1115 (1995). "[T]he contacts relevant to a choice-of-law decision include 'the place of contracting, negotiation, performance, location of the subject matter of the contract, and the domicil[e], residen[ce], place of incorporation, and business of the parties .' " *Id.* (quoting *Palmer v. Beverly Enters.*, 823 F.2d 1105, 1109–10 (7th Cir.1987) (citations omitted)). In the present case, Mr. Bradley's employment contract was executed through TNT's New York office. Mr. Bradley negotiated the contract with Fil DiNardo in New York. Additionally, performance of the contract started when Mr. Bradley moved to New York and began working for TNT in New York. TNT is a Delaware corporation with its principal place of business in New York. New York has the "most significant contacts" with the contract at issue and thus, New York law governs this dispute.

## "Career Loss" Claim

Mr. Bradley claims that TNT breached the employment contract by failing to consider him for a senior management position. TNT maintains that: 1) it was not required to consider Mr. Bradley for a position unless a job materialized and he was qualified, 2) Mr. Bradley has no proof that he was not consid-

ered for a senior management position, and 3) Mr. Bradley was considered and promoted when he was given the regional sales manager position in Chicago.

■ To prove a breach of contract under New York law, Mr. Bradley must prove: 1) there was a contract between himself and TNT, 2) Mr. Bradley performed under the contract, 3) TNT breached its contractual duties, and 4) damages resulted from the breach. *Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.*, 893 F.Supp. 285, 290 (S.D.N.Y.1995) (citation omitted). TNT argues it fulfilled its obligations under the employment contract in a variety of ways and thus, did not breach its contractual duties. TNT first argues that, based upon the language of the contract, it was not under a contractual obligation to consider Mr. Bradley for a senior management position. The relevant portion of the employment contract provides:

> [y]ou have clearly indicated that your objective is to eventually secure a senior role in line management. It is understood that this assignment is not a promise that such a position will materialize and that you will be given consideration for such a position along with other internal and/or external qualified candidates. Until such an assignment should materialize, you completely understand that you will work on a project management basis.

(Pl.Ex. A at 21). The language of the contract is unambiguous. It states that Mr. Bradley's job as a commercial manager does not a guarantee that a senior management position will materialize. But, if such a position does materialize, TNT will consider Mr. Bradley for the position. TNT reserved the right to consider other qualified candidates for the open positions.

Although TNT argues to the contrary, the phrase "is not a promise" does not modify the second clause of the second sentence. To find otherwise would allow TNT to never

have to consider Mr. Bradley for a senior management position. Such a reading makes little sense. First, given Mr. Bradley's clear interest in obtaining a senior management position, he is unlikely to have signed a contract that allowed TNT to never consider him for a senior management position. Second, the last sentence of the contract section, noting that Mr. Bradley would work as a commercial sales manager "[u]ntil" a senior management position materialized, indicates Mr. Bradley would be given consideration as soon as a position was available.

TNT, in its reply brief, retreats from its original reading of the contract language and contends that, at the very least, TNT did not have to consider Mr. Bradley for a senior management position unless he was qualified. The express language of the contract, however, does not require Mr. Bradley to be qualified to be considered for a senior management position. It states he will be considered, along with other qualified candidates. The contract language indicates that the parties considered Mr. Bradley qualified for senior management positions and TNT was simply reserving the right to consider other qualified candidates as well as Mr. Bradley for available positions. Without such a clause, TNT would essentially have contracted to promote Mr. Bradley to the next available senior management position, a result it was, not surprisingly, hesitant to put in the contract.[2]

TNT next argues that Mr. Bradley has failed to present evidence indicating that he was not, in fact, considered for a senior management position. Mr. Bradley admits that he is personally unaware of whether he was considered for the vice president positions that resulted from the February, 1995, TNT restructuring. (Bradley Dep. at 231). Mr. Bradley does state, however, that when he accepted employment at TNT he was assured by Mr. DiNardo, a Human Resources vice president at TNT, that he would be

---

**2.** At best, TNT may be able to prove that the contract language regarding Mr. Bradley's qualifications for a senior management position is ambiguous. Under New York law, "[w]hen the language of a contract is ambiguous, its construction presents a question of fact which may not be resolved by the court on a motion for summary judgment." *Jackson Heights Med. Group, P.C. v. Complex Corp.*, 222 A.D.2d 409, 411, 634 N.Y.S.2d 721, 722 (N.Y.App.Div.1995). Further, TNT does not argue Mr. Bradley was unqualified for a senior management position. Accordingly, summary judgment is inappropriate based on TNT's argument.

considered for senior management positions through a notification and interview process. (Bradley Aff. ¶ 12). This never occurred. While TNT notes Mr. Bradley never formally asked to be considered for each and every senior management position that arose, he did not have to make such requests since his request for consideration for these jobs was part of his employment contract.[3]

Additionally, both Mr. Bradley and Paul Jasko, Mr. Bradley's supervisor in Chicago, provide affidavit testimony indicating that when David Siegfried became president and CEO of TNT's North American Region, he summarily filled senior management positions with employees from his former employer, Roadway Global Air, without considering any internal TNT candidates. (Bradley Aff. ¶¶ 50–51; Jasko Aff. ¶ 12). Mr. Bradley testified to at least two senior management positions, vice president for sales and marketing and general manager of world express freight, that were filled by ex-Roadway Global Air employees. (Bradley Dep. at 157–59).

Mr. Bradley offers two other pieces of evidence that indicate he may not have been considered for senior management positions that became available. In September, 1995, Mr. Bradley wrote Joe Schaffer, who had taken over Fil DiNardo's job as vice president of human resources at TNT, and inquired as to whether he had been a candidate for the regional sales manager position of the restructured western region and if so, why he failed to satisfy the requirements of the position. (Pl.Ex. A at 63). The position had been filled by Kevin Shipman, the regional sales manager of the western region before restructuring. Mr. Bradley never received a response from TNT. Mr. Bradley also notes that shortly after he accepted a position in New York as a commercial manager, Tom Cox, the president and CEO of TNT's North American region, sent Mr. DiNardo a memo asking whether it was possible to "get out of the Sean Bradley acquisition?" (Pl.Ex. B at T60). It is a fair inference that TNT had second thoughts about hiring Mr. Bradley and consequently, may have been less likely to consider or promote him to a senior management position. In sum, Mr. Bradley's evidence creates a genuine issue of fact as to whether he was ever considered for available senior management positions at TNT.[4]

Finally, TNT argues that it fulfilled its contractual obligations because Mr. Bradley was considered for and consequently promoted to the position of regional sales manager for the central region after the February, 1995 restructuring. Mr. Bradley admits that the regional sales manager position was a move forward from his temporary position in New York, but argues that it was neither the senior management position he coveted nor the type of position that the employment contract envisioned he would be given consideration.

Mr. Bradley believes that his move to regional sales manager was a lateral move to a non-senior management position that did not progress his career at TNT. (Bradley Dep. at 129, 246). This assessment is supported by Paul Jasko, Mr. Bradley's immediate supervisor in Chicago, who agreed that the regional sales manager job was "at best a lateral move, if not a step backward." (Jasko Aff. ¶ 8). Mr. Bradley's analysis of the regional sales manager job is supported by his previous experiences with TNT. Shortly after accepting the New York offer in October, 1994, Mr. Bradley was informed by Mr. DiNardo that he would be offered a sales manager position in lieu of the commercial manager position. Mr. Bradley informed TNT he

3. Mr. Bradley may also have been unaware that positions were available until after they were filled. (Bradley Dep. at 155–56). Mr. Bradley testified that "normal vacancy bulletins" were not distributed for various senior management positions. Requiring Mr. Bradley to ask to be considered for senior management positions under such circumstances is illogical.

4. TNT's argument that, since Roger Corcoran, the president and CEO of TNT's North American region from January, 1995 to May, 1995, had a copy of Mr. Bradley's resume Mr. Bradley must have been considered for all available positions, is not persuasive. Mr. Corcoran only headed TNT for part of the time Mr. Bradley was in the United States. Further, simply because Mr. Corcoran had heard about Mr. Bradley's interest in a senior management role and had seen Mr. Bradley's resume does not mean Mr. Bradley was actually given consideration for a senior management position.

would not move to the United States to work as a sales manager since it would be a move backward from his position in Dubai and did not meet his ultimate objective of gaining a role in senior management. (Bradley Aff. ¶ 22). Consequently, Mr. DiNardo informed Mr. Bradley he could still have the commercial manager position.

■ Given this sequence of events, it is quite possible that, while the regional sales manager position was more attractive than the temporary commercial sales manager position, it was not a senior management position contemplated by the contract. At the very least, there are genuine issues of fact as to whether Mr. Bradley's move to regional sales manager satisfied TNT's obligations under the contract.

■ TNT next contends that, even if it did breach the employment contract, summary judgment is appropriate because Mr. Bradley's damages are purely speculative. As an initial matter, "a failure of proof of damages does not justify the dismissal of a claim for breach of contract, as it does most tort claims. The victim of a breach of contract is always entitled to nominal damages if he proves a breach but no damages." *Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1366, 1372 (7th Cir.1990) (holding that district court should not have directed verdict on breach of contract counterclaim for lack of evidence on damages); *accord Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 595 N.Y.S.2d 931, 934, 612 N.E.2d 289, 292 (N.Y.1993). Accordingly, I will consider TNT's argument a motion in limine to confine the amount of damages Mr. Bradley may argue to the jury.

■ "[I]t is a basic tenet of the law of damages that where there has been a violation of a contractual obligation the injured party is entitled to fair and just compensation commensurate with his loss." *Terminal Cent., Inc. v. Henry Modell & Co., Inc.*, 212 A.D.2d 213, 218, 628 N.Y.S.2d 56, 59 (N.Y.App.Div.1995) (citations omitted).

Damages, however, may not "be awarded on the basis of conjecture and guesswork." *Schanbarger v. Edward Dott's Garage, Inc.*, 72 A.D.2d 882, 883, 421 N.Y.S.2d 937 (N.Y.App.Div.1979) (citation omitted). Additionally, "[d]amages that are uncertain, contingent, or speculative may not be recovered." *Kenford Co., Inc. v. County of Erie*, 108 A.D.2d 132, 136, 489 N.Y.S.2d 939, 943 (N.Y.App.Div.1985) (citations omitted), *rev'd on other grounds*, 73 N.Y.2d 312, 540 N.Y.S.2d 1, 537 N.E.2d 176 (N.Y.1989). Mr. Bradley argues he suffered damages because: 1) he lost fourteen months of career advancement by working for TNT, and 2) he gave up more lucrative offers to work for TNT.

Mr. Bradley offers no figure or method for calculating what his "career loss" might be for working for TNT for fourteen months. He simply states TNT deprived him of the investment of fourteen months of his career. Without more, Mr. Bradley is simply speculating and conjecturing as to what his fourteen months might be worth in terms of career advancement. Since Mr. Bradley offers no concrete numbers or method for valuing his loss of career potential, he may only recover nominal damages on that ground.

Mr. Bradley also states that he gave up a more lucrative job in Dubai and a more lucrative offer in Singapore when he accepted the TNT job. Mr. Bradley argues that if he had known TNT was not going to honor the employment contract he would have remained in or taken a job that paid more. At the very least, Mr. Bradley claims, he should be able to recover the difference between his compensation at TNT and either the job he left in Dubai or could have taken in Singapore. Mr. Bradley valued his compensation while working in Dubai at $89,400.[5] He believes that he could have made $86,250 if he had taken the job in Singapore.[6] The TNT job included salary and a car allowance (valued by Mr. Bradley at $57,440), a six-month housing allowance ($9,000), a disturbance allowance ($3,000), a retirement plan contribution ($5,750), leave tickets (value unknown),

---

5. This figure is based upon a tax-free salary, car allowance, free housing, and bonus. (Bradley Aff. ¶ 5).

6. This figure is based upon salary, a provided car, free housing, and a bonus. (Bradley Aff. ¶ 10).

temporary housing (value unknown), and other various sums. At a minimum, this compensation package amounted to $75,190, and in all likelihood, Mr. Bradley was compensated in excess of this sum while working for TNT.

█ Mr. Bradley has presented a legitimate basis for the computation of damages, specifically, the difference between his Dubai compensation and his TNT compensation.[7] It is unclear on the record before me whether a difference in compensation between Dubai and TNT exits.[8] If a difference does exist, it appears to be well below the $81,-666.66 Mr. Bradley has calculated for damages on this claim. Still, it may be greater than the nominal damages to which Mr. Bradley is entitled. It is also unclear whether Mr. Bradley is making more or less money with DHL than he did with TNT. If he is making less money, he may be able to recover the difference in compensation between his TNT compensation and his current compensation. Again, it appears this sum is substantially less than the damages Mr. Bradley is claiming. Mr. Bradley's recovery on his "career loss" claim will be limited to the difference in compensation packages between Dubai and TNT and between TNT and DHL if such differences exist.

### Expense Claims

Mr. Bradley also believes he is owed money for leave tickets and a retirement payment.[9] The employment contract provides that TNT "will contribute to [Mr. Bradley's] current retirement not to exceed $5,750." Mr. Bradley claims TNT failed to make this annual or pro rata payment after November, 1995. The contract does not provide for annual payments. It simply states that TNT will pay a sum up to $5,750 into Mr. Bradley's retirement plan. In April, 1995, TNT paid $6,730.70 to Eagle Star (International Life) Ltd., the provider of Mr. Bradley's retirement plan. This is in excess of the amount stated in the contract. Mr. Bradley has presented no evidence besides unsubstantiated allegations that TNT should have paid more than it did. Thus, summary judgment for TNT on this claim is proper.

Mr. Bradley also argues he is owed $10,-776.55 for leave tickets. The employment contract states that Mr. Bradley and his wife would each be entitled to one round trip discounted air ticket to Mr. Bradley's home country within a year of his beginning employment at TNT. On October 27, 1995, Mr. Bradley submitted an expense report seeking reimbursement in the amount of $6,803.98 for two airline tickets to Dubai. On December 12, 1995, Mr. Bradley submitted an additional expense report seeking reimbursement in the amount of $4,300.85 for a third airline ticket to Dubai. Mr. Bradley admits he did not utilize the airline tickets for which he sought reimbursement. (Bradley Dep. at 178). Mr. Bradley did travel to Dubai in October, 1995, with his wife and son, on other, less expensive tickets. Mr. Bradley did not submit reimbursement requests for the tickets that were actually used.

The contract specifically states Mr. Bradley is entitled to two leave tickets to travel to his home country. Thus, Mr. Bradley may be able to recover for two of the tickets he actually used to travel to Dubai. Although this sum is less than that requested on the reimbursement requests, it may still be recoverable under the contract. Accordingly, summary judgment is inappropriate on this claim.[10]

---

7. Since the Dubai compensation is higher than the amount Mr. Bradley could have earned in Singapore, I will use it in lieu of the Singapore compensation.

8. There is insufficient information in the record to know Mr. Bradley's exact compensation both in Dubai and at TNT. For instance, Mr. Bradley figured his compensation at TNT at a time his car allowance was $95. When Mr. Bradley moved to Chicago his car allowance was increased to $125, but the record is unclear as to wether this change was used in calculating the TNT compensation..

9. Mr. Bradley also claims TNT owes him $13,-967.58 for a housing allowance, closing costs, and a second disturbance allowance. TNT concedes in its reply brief that there are disputed issues of fact regarding whether Mr. Bradley is owed these sums. Accordingly, summary judgment is inappropriate on these claims.

10. The parties dispute whether Mr. Bradley's home country is the United Kingdom or the

*TNT's Counterclaim for Breach of Contract*

TNT moves for summary judgment on its counterclaims against Mr. Bradley for breach of contract and breach of the implied covenant of good faith and fair dealing. The contract contains a provision requiring Mr. Bradley to reimburse TNT for all costs associated with Mr. Bradley's relocation from Dubai to the United States should he voluntarily leave TNT within two years of beginning employment. Mr. Bradley left after fourteen months. To prove breach of contract, however, TNT must prove it performed its duties under the employment contract. *Mark I Mktg. Corp.*, 893 F.Supp. at 290. As noted above, there is a genuine issue of material fact as to whether TNT breached the employment contract. Accordingly, summary judgment on TNT's counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing is denied.[11]

### Conclusion

For the foregoing reasons, Mr. Bradley's career loss claim survives TNT's motion for summary judgment, but his recovery will be limited to the difference in compensation between his jobs in Dubai and with TNT. TNT's motion for summary judgment is granted with respect to Mr. Bradley's claim for retirement plan contributions, but is denied on Mr. Bradley's claim for reimbursement for leave tickets. TNT's motion for summary judgment on its counterclaims is denied.

---

United Arab Emirates. In this regard, there is also a disputed genuine issue of material fact.

**11.** Mr. Bradley also moves to strike various TNT affidavits and disqualify the law firm of King, Pagano, & Harrison from representing TNT in this litigation. I have disregarded the argument in the LaPonte affidavit. I agree that evidence of settlement negotiations should not be included in affidavits in support of summary judgment. That portion of the Pagano affidavit will be stricken. The motion for disqualification of counsel is, however, without merit.