**SOKAOGON CHIPPEWA COMMUNITY,**
Plaintiff–Appellant,

v.

**EXXON CORPORATION, State of Wisconsin, Forest County, et al.,**
Defendants–Appellees.

No. 92–3920.

United States Court of Appeals,
Seventh Circuit.

Argued May 10, 1993.

Decided Aug. 12, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 20, 1993.

Milton Rosenberg, Madison, WI (argued), Daniel W. Stevens, Esser, Dieterich & Stevens, Menomonee Falls, WI, for plaintiff-appellant.

Charles G. Curtis, Jr., Foley & Lardner, Madison, WI, John D. Niemisto, Asst. Atty. Gen., Wisconsin Dept. of Justice, Madison, WI (argued), David E. Beckwith, David Lucey, Foley & Lardner, Milwaukee, WI, Lawrence R. Heath, Richard J. Shawl, Office of Corp. Counsel, Rhinelander, WI, Fred W. Kawalski, Office of Corp. Counsel, Antigo, WI, Truman Q. McNulty, Frisch Dudek, Ltd., Milwaukee, WI, Robin Stowe, Office of Corp. Counsel, Antigo, WI, for defendants-appellees.

Before POSNER and FLAUM, Circuit Judges, and WILL, Senior District Judge.[*]

POSNER, Circuit Judge.

The Sokaogon Chippewa Community, an Indian tribe, brought this suit in 1986 against the United States, Exxon Corporation, the State of Wisconsin, and various political subdivisions of the state, seeking a declaration that the tribe has the right to occupy a tract of 144 square miles in northeastern Wisconsin which contains potentially valuable mineral deposits. The jurisdiction of the federal district court was based on 28 U.S.C. § 1362, which gives the federal courts jurisdiction over suits by Indian tribes arising under treaties or other federal laws; the tribe's claim, as we shall see, is based on a treaty. The district judge dismissed the suit on the ground that the United States was entitled to get out of the case because the statute of limitations had run, and, the United States being an indispensable party, the suit could not proceed against the other defendants in

[*] Hon. Hubert L. Will of the Northern District of Illinois, sitting by designation.

its absence. We reversed in part, agreeing that the United States should be dismissed but not that it was an indispensable party; so the suit could continue against the other defendants. *Sokaogon Chippewa Community v. Wisconsin*, 879 F.2d 300 (7th Cir.1989). On remand, the district judge dismissed the State of Wisconsin on Eleventh Amendment grounds that the Sokaogon do not contest and granted the remaining defendants' motion for summary judgment. *Sokaogon Chippewa Community v. Exxon Corp.*, 805 F.Supp. 680 (E.D.Wis.1992).

The Sokaogon base their claim on a treaty that the United States signed in 1842 with representatives of the Chippewa (Ojibwa) nation, of which the Sokaogon were and are a part, though they went at the time by a different name. 7 Stat. 591. In the treaty the Chippewa ceded a large amount of land, including the land in question in this case, to the United States, but reserved "the right of hunting on the ceded territory, with the other usual privileges of occupancy, until required to remove by the President of the United States." We may assume (without however deciding, because the issue is in doubt) that the 1842 treaty entitles the Sokaogon to occupy the tract in question unless they surrendered their right of occupancy in a subsequent treaty that the United States signed with the Chippewa in 1854. 10 Stat. 1109. The district judge held that they had, and if he was right—more precisely, if there is no triable issue concerning the effect of the later treaty in eliminating the Sokaogon's right of occupancy—then summary judgment was properly granted for the defendants.

The 1854 treaty was between the United States and two separate Chippewa nations, the Lake Superior Chippewa and the Mississippi Chippewa, but we can confine our attention to the former because the Sokaogon are Lake Superior Chippewas and the land in question in this case had been ceded by the Lake Superior Chippewa in the 1842 treaty. The later treaty designates additional lands ceded to the United States, but most of its provisions are taken up with specifying the consideration for the cessions made by the Chippewa in both treaties. The main consideration specified is of two sorts, annual pay-ments to the tribes in cash and kind (including beaver traps and blacksmiths) and the establishment of several small reservations at specified locations. Some of these reservations are earmarked for particular tribes (called "bands" in the treaty). One of the reservations, however, is "for the La Pointe band, *and such other Indians as may see fit to settle with them*" (emphasis added), while another, which is to consist of tracts abutting two lakes, Lac du Flambeau and Lac Court Oreilles, is "for the other Wisconsin bands." The treaty does not mention the "Post Lake" bands, two small offshoots of what the treaty elsewhere calls the "Lac Du Flambeau Band" of Wisconsin Chippewas. This is a potentially significant omission because the Post Lake bands are the name by which the Sokaogon tribe was known at the time the treaty was signed.

The last paragraph states that the treaty has been signed by two U.S. commissioners and "the undersigned chiefs and headmen of the Chippewas of Lake Superior and the Mississippi." (There are also signatures by interpreters and witnesses.) The signatures (actually x's) of the Indians are grouped under the names of different bands—the La Pointe Band, the L'Anse Band, and so forth. Two of the bands listed in the signature section are the "Lac Court Oreille Band" and the "Lac Du Flambeau Band." Among the signatures grouped under the latter heading are "Me-gee-see" and "Ne-gig," the respective heads of the two Post Lake bands.

The defendants argue that the government's promise to create, abutting lakes Flambeau and Court Oreilles, a reservation "for the other Wisconsin bands" was in fact a promise to create separate reservations for the Lac du Flambeau and Lac Court Oreilles tribes; that the Post Lake bands were a part of the Lac du Flambeau tribe and therefore entitled to reside in the reservation created for that tribe; but that if the Post Lake bands wanted to live in a different reservation they could always go to live in the one for the La Pointe tribe, since that reservation was expressly "for the La Pointe band, and such other Indians as may see fit to settle with them." At the time there were no more than about 200 Post Lake Indians (today

there are about 1300 Sokaogon Indians), and it would have been odd to create a separate reservation for so small a community.

The reservations specified in the treaty were in fact created, and the land at issue in this case does not fall within the boundaries of any of them. The Post Lake bands signified their acceptance of the treaty not only by the signatures of their chiefs but also by accepting the annuities which the government paid them, as promised in the treaty, along with the other Chippewa tribes. The Post Lake bands did not, however, actually move to any of the reservations created by the 1854 treaty. They wanted their own reservation and kept asking the U.S. government to establish one for them and meanwhile they continued to live where they had lived before the treaty was signed—namely, on the tract in dispute in this case. Not until the 1930s did the government finally create a reservation for the Sokaogon (as they were now known), and even after the creation of this reservation many Sokaogon continued to reside in their traditional area. They do not argue that this continued residence establishes a right of occupancy that is good against Exxon and the other landowners who claim title to portions of the contested tract through grants by the United States. They argue that either they were not parties to the 1854 treaty and therefore can continue to assert their rights under the 1842 treaty or that, if they were parties, the 1854 treaty does not mean what it says.

They point out that that treaty does not even mention the Post Lake bands and that the published memoir of a white man who attended the council of the Lake Superior Chippewas held the following year, when the first annual payment called for by the treaty was delivered, states that at the council Chief Me-ge-see told the Commissioner of Indian Affairs (George Manypenny) that his band "was unprovided for, and without any right of location upon any of the reservations," and that in response "the commissioner directed [Me-gee-see] to come to his office after council." An oral tradition of the Sokaogon holds that beginning in 1854 Commissioner Manypenny and his successors repeatedly promised the Post Lake bands their own reserva-

tion; but there is no documentation of this tradition, which is at best embroidered (too many ransoms, shipwrecks, lost and stolen maps, and deathbed revelations to be plausible) and at worst fictitious. Manypenny was not involved in the negotiations for the treaty and did not sign it, although these facts are not in themselves conclusive; he might still have made a promise, though with what authority is unclear. Beginning in 1860 various white Indian traders repeatedly petitioned the Commissioner of Indian Affairs on behalf of the Post Lake bands to establish a separate reservation for the bands, and some of these petitions state that the reservation had been "promised" to the bands, which the plaintiff construes as evidence either that the Post Lake bands were never parties to the 1854 treaty or that the government failed to fulfill a treaty obligation to create a separate reservation for them. No government document so much as hints at any such promise, however, and several government documents state that the Post Lake bands are not entitled to their own reservation but must remove to one of the reservations created by the 1854 treaty. Because northeastern Wisconsin was sparsely populated, the government decided not to use force against the Post Lake bands. But it never acknowledged their right either to remain where they were living or to have a reservation created specially for them. It took the position that they were bound by the 1854 treaty, that the government had performed its treaty obligations to them by creating reservations that they had a right to occupy, and that they were merely squatters on the land on which they continued to live.

Some of the petitions acknowledge that under the treaty the Post Lake bands were to be treated as part of the Lac du Flambeau band and thus entitled to live on its reservation. They say such things as, "we have a share in the Flambeau reservation"; "[the Post Lake bands] respectfully ask that they may be united with the Bands of Chippewa Indians at Lake du Flambeau ... just as soon as their Great Father will furnish them the necessary facilities to go to farming"; "we do not want to move to the Lake Flambeau reservation to which we were apportioned by the treaty of 1854." An affidavit

from an ethnohistorian points out (what is anyway pretty obvious) that these documents were not in fact prepared by Indians, who could not read or write, but by white men who may not have understood what the Indians were trying to tell them, and that in addition the Indian signatories of the 1854 treaty may not have had a clear idea of what exactly they were giving up. The Indians' notion of "property," if indeed they can be said to have had one, differs greatly from that of the Western legal and political tradition, which views "property" in land in abstract terms, as a (qualified) legal right to prevent entry upon and the use and enjoyment of a tract of land identified by visible or invisible boundary lines.

Read as a whole, the 1854 treaty unambiguously cedes the Chippewas' lands, including those of the Post Lake bands, whose chiefs signed the treaty along with the chiefs of the other Chippewa tribes, to the United States in exchange for a promise of reservations and annual payments. Even the signatory of an unambiguous contract can argue that it should be rescinded because it was procured by fraud or because the other party to the contract reneged on his promise, but the Sokaogon do not ask us to rescind the treaty or suggest that we have the power to do so. Any inference that their predecessors, the Post Lake bands, did not become parties to the treaty because they are not mentioned in it is refuted by the Sokaogon's acknowledgment that the chiefs of the bands were signatories and by the acknowledged objective of the treaty, which was to extinguish the Indians' rights of occupancy in Wisconsin and the other states in which the Chippewas were living so that white settlers could farm and build permanent structures without interference from the Indians. This objective required obtaining the agreement of, and thus binding, all the Chippewa tribes including the Post Lake bands, which despite their small size were known to be living in northeastern Wisconsin. The federal government apparently believed them to be a part of the Lac du Flambeau tribe, for which a reservation was being created, but took care to get the signatures of their chiefs; and the catch-all provision in the grant of the reservation to the La Pointe Indians made sure that any tribes not explicitly provided for would have an Indian community in which to live.

The plaintiff argues that even if the Post Lake bands were parties to the treaty, nevertheless the treaty conditioned the surrender of their right of occupancy under the 1842 treaty on the federal government's creating a separate reservation for the bands. They point out that the La Pointe and Lac du Flambeau reservations are remote from the area in which the Post Lake bands resided; the Lac du Flambeau reservation is only about 75 miles away, but that was a long distance in 1854. They argue that Me-gee-see and Ne-gig would not have signed the treaty had they not been promised a separate reservation. There is no textual handle for this claim, however; it is in tension with the catch-all provision relating to the La Pointe reservation and with the evidence that the Post Lake bands were components or affiliates of the Lac du Flambeau band; and it has no documentary support. The Post Lake Indians may have thought they had been promised a separate reservation where they were living, but there is no indication that their signing the treaty was conditional on the fulfillment of such a promise.

We must however consider the possible bearing of the distinction emphasized in previous cases, in particular *Lac Courte Oreilles Band v. Voigt,* 700 F.2d 341, 362–65 (7th Cir.1983), between usufructuary rights and rights of occupancy. The former are rights in particular uses of land, such as (with reference to typical Indian uses) picking berries, trapping beavers, fishing, and performing religious rites at ancestral burial grounds. The latter are rights of permanent occupancy. The 1842 treaty, while ceding lands occupied by the Chippewa Indians to the United States, had reserved to them the right to hunt and "the other usual privileges of occupancy" until removed by order of the President. This oddly worded grant (for the right to hunt is not a privilege of occupancy, but of use) we interpreted in *Voigt* to cover both usufructuary and occupancy rights, and we held that the treaty of 1854 had abrogated only the latter, and only for tribes covered by that treaty. The idea behind the treaty, we explained, was that the Indian tribes that

were parties to it would be given reservations as their place of permanent occupation but that they could continue to use the land outside the reservations for hunting and so forth until the time came when their using it would impede occupation by white settlers.

 The 1854 treaty does not distinguish explicitly between usufructuary and occupancy rights. It does not, moreover, appear to cede any land in Wisconsin—that land had been ceded by the 1842 treaty, in which the reservation of "other privileges of occupancy" had appeared. The interpretation of the 1854 treaty in *Voigt* as extinguishing occupancy rights was an inference from the fact that the treaty established Indian reservations and from the purpose reasonably to be ascribed to the treaty. The reservations created a place for the Chippewas to enjoy occupancy rights because they would no longer have such rights off the reservations. The hope was that the Chippewas would "settle down" and live like white men, farming the reservations. This is a perfectly intelligible interpretation of the treaty, but is it so clearly right as to dispense with the need for a trial? *Voigt* may be thought to have crossed this bridge, but we must remember that the Sokaogon unlike the tribes in that case claim not to have been a party to the 1854 treaty and we must remember too that we have been told to interpret Indian treaties in favor of the Indians, within the bounds of reason of course. *South Dakota v. Bourland,* — U.S. —, —, 113 S.Ct. 2309, 2316, 124 L.Ed.2d 606 (1993); *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 247, 105 S.Ct. 1245, 1258, 84 L.Ed.2d 169 (1985); *Winters v. United States,* 207 U.S. 564, 576–77, 28 S.Ct. 207, 211–12, 52 L.Ed. 340 (1908); *Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 89, 39 S.Ct. 40, 41, 63 L.Ed. 138 (1918); *Lac Courte Oreilles Band v. Voigt, supra,* 700 F.2d at 350. Indian treaties are to be interpreted as the Indians themselves would have done, even if the understanding of the agents who negotiated and signed them on behalf of the federal government was different. *Jones v. Meehan,* 175 U.S. 1, 10–11, 20 S.Ct. 1, 4–5, 44 L.Ed. 49 (1899); *Lac Courte Oreilles Band v. Voigt, supra,* 700 F.2d at 350. Ambiguities and mistakes alike are to be resolved in favor of the Indians, in recognition of the disadvantages of knowledge and power under which they labored in negotiating these treaties with a nation determined to use force if necessary to open up Indian lands to white settlement.

 All this considered, we think the grant of summary judgment was proper. The defendants presented an interpretation of the treaty that was sensible, consistent with and indeed implied by its language, and consistent with all reasonably substantiated facts concerning the circumstances in which the treaty had been negotiated and signed. The treaty's purpose, as could be gathered from its words and logic and structure and the background circumstances, and for that matter the subsequent history up to the creation of the Sokaogon's own reservation in the 1930s, was to extinguish the Chippewa Indians' occupancy rights throughout the ceded (including previously ceded) areas in exchange for annual payments and for occupancy rights in reservations that would be established by the federal government. The treaty was intended to bind what are now the Sokaogon. Their authorized representatives signed it on the Sokaogon's behalf, thus making the Sokaogon a party; pursuant to the treaty, a reservation was created for Chippewas not specifically provided for in the treaty; and the placement of the chiefs' signatures confirmed that the Sokaogon (Post Lake) Indians would be entitled if they preferred to remove to the reservation expressly created for the Lac du Flambeau tribe. No explanation has been offered for why if the Post Lake Indians were clamoring for their own small reservation the treaty did not promise it to them.

 To ward off summary judgment under *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Sokaogon had to present evidence which might persuade a reasonable trier of fact either that they had not in fact been a party to the treaty or that the treaty had not extinguished their rights of occupancy. The oral tradition of a promised reservation is not *evidence,* that is, evidence admissible in a court of law, which is what Fed.R.Civ.P. 56

explicitly requires in order to create a triable issue; at least no effort was made by the Sokaogon's counsel to cast it into a form in which it would be admissible in a court of law. The admissibility of the documents in which the Indians' agents referred to a "promised" reservation, however, is not contested (those documents come within the hearsay exception for "ancient documents," Fed.R.Evid. 803(16)); and while these documents are consistent with an inference that the reservation at Lac du Flambeau *was* the promised reservation, they do not compel that inference. But neither do they support the inference that the Post Lake bands retained their rights of occupancy despite the 1854 treaty. Of that there is no evidence other than what might be inferred from the treaty's silence with respect to those bands. Yet not only did their chiefs sign, but the bands accepted the benefits of the treaty—or at least the annual payments stipulated in the treaty, which were a principal part of the consideration. This implies that they accepted the burdens of the treaty as well—for one cannot limit the enforcement of a contract to a provision which happens to benefit the plaintiff—and thus that they surrendered their right of occupancy. Otherwise it would have been all take and no give. The testimony of an ethnohistorian or anthropologist might be admissible to explain the Indians' understanding of these documents or of the treaty, but the Sokaogon have not presented an affidavit or other evidence from any qualified person who is willing to attest that the Post Lake bands did not think that the 1854 treaty extinguished their rights to occupy land outside Indian reservations. A trier of fact would not be permitted to indulge the speculation that Me-gee-see and Ne-gig signed the treaty for the heck of it, believing that the bands which they headed up could thereafter exclude white settlers while receiving an annuity from the federal government.

Even if the government made and broke a promise to create a reservation covering the very land at issue in this case, this would not in itself abrogate the Post Lake bands' relinquishment of occupancy rights in the 1854 treaty. They would have to show that the later treaty conditioned that relinquishment on the creation of a separate reservation for them. Nothing in the treaty itself, the oral tradition, or the extensive documentation submitted by the parties supports the inference of such a condition. A letter dictated by Me-gee-see and Ne-gig in 1869 comes closest; it alleges that the promise of a separate reservation induced them to sign the 1854 treaty. But the Sokaogon do not seek either to enforce or to abrogate that treaty. They seek to enforce their rights under the earlier treaty, and nowhere in the voluminous materials on which they rely is there any intimation of a claim to remain on the land *under the 1842 treaty.* Nowhere is there a suggestion that the 1854 treaty was suspended until the separate reservation was created. No doubt, as held in *United States v. Bouchard,* 464 F.Supp. 1316, 1354–55 (W.D.Wis.1978), reversed on other grounds under the name *Lac Courte Oreilles Band v. Voigt, supra,* the tribes that were parties to the 1854 treaty did not actually relinquish their right of occupancy until the reservations promised in the treaty were actually created; otherwise there would have been an interval in which they had no right of occupancy anywhere. But once the reservations in which the Sokaogon had rights of occupancy were created, their rights of occupancy under the 1842 treaty, as distinct from their usufructuary rights under it, ceased.

■ The test for summary judgment is whether, if the record compiled in the summary judgment proceeding were the record of a trial, the judge would be required to grant a motion for directed verdict to the movant, the defendants in this case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). He would be here.

AFFIRMED.