*452 COFFEY, Circuit Judge.
The Menominee Indian Tribe of Wisconsin appeals the district court’s dismissal of its lawsuit seeking a declaration of the Tribe’s usufructuary rights on certain off-reservation lands set forth in a series of mid-nineteenth century treaties, as well as the enforcement of those rights by means of injunctive relief. The district court dismissed the lawsuit, concluding that the Tribe does not retain any aboriginal right to special treatment in hunting and fishing on off-reservation lands and that any off-reservation use rights reserved in the Treaty of 1831 were extinguished either by explicit conditions in that treaty or by removal provisions in subsequent treaties. We affirm.
I. BACKGROUND
A. The Treaty Process
Before addressing the claims presented in this appeal, we think it is both helpful and necessary to explain in detail the histoiy of the treaty process between the United States and the Menominee Tribe. In 1831, the Menominee Indian Tribe and the United States signed a treaty resolving various disputes involving land in the state of Wisconsin that was traditionally used and occupied by the Menominee Indians. The Tribe agreed to “cede and forever relinquish to the United States, all their country [in Wisconsin] on the southeast side of Winnebago lake [sic], Fox river [sic], and Green bay [sic].” 1831 Treaty Art. Third, 7 Stat. 342, 343 (Feb. 8, 1831). The government intended to survey and sell the Wisconsin land east of the Fox River to white settlers. 1831 Treaty Art. Sixth. The Tribe also ceded a large tract of land west of the Fox River in the state of Wisconsin. 1831 Treaty Art. First. The government wanted to relocate several tribes from New York to the state of Wisconsin and settle them on the Menominee lands west of the Fox River. The Treaty, however, provided that if the New York tribes did not occupy these lands, “such portion as would have belonged to said [New York] Indians, had it been occupied, shall revert to the United States ... to be laid off by the President.” 1831 Treaty Art. First. In exchange for the land, the government agreed to protect, pay and provide various goods and services[1] to the Menominee Tribe. See 1831 Treaty Ate. Third, Fourth, Fifth, and Sixth ¶ 3.
In the 1831 Treaty, the Tribe reserved the right to use the land ceded on the east side of the Fox for hunting and fishing. 1831 Treaty At. Sixth at ¶ 1. Specifically, the Treaty states:
The Menomonee [sic] tribe of Indians shall be at liberty to hunt and fish on the lands they have now ceded to the United States, on the east side of Fox river [sic] and Green bay [sic], with the same privileges they at present enjoy, until it be surveyed and offered for sale by the President; they conducting themselves peaceably and orderly.
1831 Treaty At. Sixth at ¶ 1. Additionally, the Treaty reserved to the Tribe hunting rights in the Wisconsin land west of the Fox “until the President of the United States, shall deem it expedient to extinguish their title.” 1831 Treaty At. Sixth at ¶ 2. The parties do not dispute that the Wisconsin land east of the Fox was shortly thereafter surveyed and offered for sale to white settlers.
In 1836, the Tribe and the United States entered into another treaty, in which the Tribe ceded additional lands west of the Fox River. 1836 Treaty Art. First ¶¶ 1, 2, 7 Stat. 506, 506-507 (Sept 3, 1836). The 1836 Treaty contains no explicit reservation of any use rights, but it provides that the Tribe would leave the ceded lands within one year of the treaty’s ratification. 1836 Treaty At. Fourth ¶ 1.
*453 In 1848, the Tribe signed another treaty in which it agreed “to cede, ... sell, and relinquish to the United States all [its] lands in the State of Wisconsin wherever situated.” 1848 Treaty Art. II, 9 Stat. 952, 952 (Oct. 18, 1848). The United States, in exchange, agreed to give the Tribe at least 600,000 acres of land located in Minnesota[2] and $350,-000. 1848 Treaty Aits. Ill, IV. Further, the government agreed to finance a Menominee delegation “[t]o enable the said Indians to explore and examine their new country, and as an inducement to an early removal thereto.” 1848 Treaty Ait. VI. Article VIII provided:
It is agreed that the said Indians shall be permitted, if they desire to do so, to remain on the land hereby ceded for and during the period of two years from the date hereof, and until the President shall notify them that the same are wanted.
The Menominee Tribe never left Wisconsin. Instead, in 1850, at the end of the two-year period, the Tribe requested and received the President’s permission to remain temporarily on land located in Wisconsin at the Wolf and Oconto Rivers. 1854 Treaty Preamble at ¶ 2, 10 Stat. 1064, 1064 (May 12, 1854).
On May 12, 1854, the Menominee Tribe and the government signed their fourth and final treaty. The preamble to the 1854 Treaty describes the terms of the 1848 Treaty, stating that the Tribe ceded all of its land in the state of Wisconsin to the United States in exchange for land in Minnesota. 1854 Treaty Preamble at ¶ 2. It then recounts the “manifestation of great unwillingness on the part of said Indians to remove to the country west of the Mississippi River ... and a desire to remain in the State of Wisconsin.” 1854 Treaty Preamble at ¶ 3. Finally, the preamble states that the purpose of the Treaty is to assuage the Tribe’s interest in establishing a permanent home in Wisconsin. 1854 Treaty Preamble at ¶ 4. To this end, the Menominee Tribe ceded their Minnesota lands (obtained in the 1848 Treaty) to the United States in exchange for a small reservation in Wisconsin at the mouth of the Oconto and Wolf Rivers. 1854 Treaty Arts. 1, 2. In addition to-providing funds for various goods and services, the government agreed to pay the difference between the value of the Minnesota land ceded by the Tribe and the value of the Wisconsin reservation granted by the government. 1854 Treaty Ait. 4.
B. The Procedural History of this Case
The Menominee Tribe brought this lawsuit seeking a declaration of their usufructuary rights off-reservation The Tribe contended that the 1831 Treaty reserved their right to hunt and fish on the lands they ceded both to the east and west of the Fox River, and that the right to fish and hunt on those lands had not been terminated by any subsequent treaty or act of Congress. Additionally, the Tribe asserted that it retains aboriginal fishing rights in Lake Winnebago and along the Wisconsin shores of Lake Michigan and the Wisconsin River. Finally, the Tribe claimed the right to harvest sturgeon off-reservation to compensate for the decrease in on-reservation sturgeon populations. The Tribe requested an injunction ordering the defendants to allow Menominee Indians to exercise their alleged off-reservation usufructuary rights free from regulation by the State.
The defendants moved to dismiss the lawsuit, arguing that the Tribe should be judicially estopped from asserting usufructuary rights arising out of the 1831 Treaty based on positions taken by the Tribe in prior litigation, and that the Treaties of 1848 and 1854 terminated any treaty-reserved or aboriginal rights the Menominee may have had on off-reservation lands. Additionally, the defendants argued that the 1831 Treaty, *454 while reserving limited usufructuary rights for the Tribe, provided that certain events would extinguish or cancel those limited rights. Specifically, the defendants claimed that the terms of the 1831 Treaty limiting the Tribe’s right to use the land east of the Fox River would terminate when the president offered the land for sale, and that the Tribe’s light to use the land west of the Fox River was dependant upon having title to that land. The defendants contended that those terminating events (i.e. the president offered the land east of the river for sale and the Tribe ceded title to the land west of the river) occurred more than a century and a half ago and, therefore, the Tribe retains no off-reservation usufructuary rights. Finally, the defendants argued that the 1854 Treaty did not guarantee the Tribe any specific amount of sturgeon and, in any event, that the district court did not have the authority to grant the Tribe off-reservation fishing rights.
The district court judge granted the defendants’ motion to dismiss. The district court dismissed the plaintiffs’ sturgeon claim because it concluded that the Menominee Tribe reserve neither off-reservation fishing rights nor the right to a specific proportion of the sturgeon catch and, therefore, that the court did not have the authority to grant the relief requested. Menominee Indian Tribe of Wisconsin v. Thompson, 922 F.Supp. 184, 214-15 (W.D.Wis.1996). The district judge concluded that the treaties were not ambiguous and therefore that the court was competent to interpret them. The court went on to hold that any usufructuary rights reserved in the 1831 Treaty were explicitly limited by extinguishing events, and that those extinguishing events had occurred. The trial judge further found that the 1848 Treaty was a removal treaty[3] which extinguished every and any tribal right to use or occupy the Wisconsin lands. Finally, the court concluded that positions taken by the Menominee Tribe in earlier litigation did not judicially estop the Tribe from asserting retention of usufructuary rights. Menominee Indian Tribe of Wisconsin v. Thompson, 943 F.Supp. 999 (W.D.Wis.1996).
II. ISSUES
On appeal, the Tribe maintains that the district court failed to heed the canons of construction for Indian treaties and improperly resolved ambiguous treaty language in favor of the defendants. Additionally, they claim that the district court converted the motion to dismiss into a motion for summary judgment by considering matters outside the pleadings and then improperly decided the case without allowing the Tribe to complete discovery and file rebuttal evidence. Finally, the Tribe renews the contentions presented in their complaint and in opposition to the motion to dismiss.
III. ANALYSIS
Before reaching the merits of the Tribe’s claims, we must resolve two procedural matters. Initially, the defendants claim that the doctrine of judicial estoppel bars the Menominee from asserting continuing usufructuary rights to off-reservation lands based on contrary positions the Tribe assumed in prior litigation. Additionally, the Menominee Tribe asserts that the district court improperly converted the defendants’ motion to dismiss into a motion for summary judgment. We are convinced that neither procedural contention has merit; therefore we evaluate the Tribe’s substantive claims and affirm the district court’s judgment.
A. Judicial Estoppel
The doctrine of judicial estoppel “provides that a party who prevails on one ground in a lawsuit cannot turn around and in another lawsuit repudiate the ground.” McNamara v. City of Chicago, 138 F.3d 1219, 1225 (7th Cir.1998). The doctrine thereby bars a party from obtaining two separate litigation victories, or a “double recovery,” by asserting opposite legal or factual contentions in two separate legal actions based on the same underlying facts. Ezekiel v. Michel, 66 F.3d 894, 905 (7th Cir.1995); Chavenat v. Williams Pipe Line Co., 11 F.3d 1420, 1427 (7th Cir.1993).
*455 The defendants contend that the Menominee Tribe may not assert usufructuary rights off-reservation because in prior cases it took the position that the various treaties at issue in this case resulted in the cession of all “right, title, and interest in and to” their Wisconsin land. Specifically, the defendants point to several claims filed in the Indian Claims Commission in which the Tribe sought compensation for the cessation of “right, title, and interest” to off-reservation lands embodied in the 1848 and 1854 Treaties. These claims were later consolidated and settled for $8,500,000. See Menominee Tribe of Indians v. United States, Nos. 44304, 44296, 44298, 44300, 44303, 44305, and 44306, 1951 WL 57 (Ct.Cl. July 13, 1951) (unpublished order) (ratifying and adopting settlement agreement between the parties). Additionally, the defendants maintain that, in a case decided by the Supreme Court in 1968, the Menominee alleged that in exchange for on-reservation usufructuary rights immune to state regulation the Tribe relinquished all right, title and interest to lands ceded in the 1831, 1836 and 1848 Treaties. See Menominee Tribe of Indians v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968) (recognizing the Tribe’s immunity from state hunting and fishing rules on reservation lands under the 1854 Treaty). The defendants argue that the position taken by the Menominee in this lawsuit (i.e., that the Tribe reserved off-reservation usufructuary rights) is opposite to the position taken by the Menominee in prior litigation (i.e., that the Menominee Tribe ceded all of its off-reservation rights).
The doctrine of judicial estoppel does not bar the Menominee contentions in this lawsuit. We agree with the district judge that it is not clear that the Menominee claims in the earlier eases are necessarily inconsistent with the position taken here. The 1968 Supreme Court case analyzed the Tribe’s on-reservation hunting and fishing rights in light of a congressional act terminating federal supervision of the Tribe. Menominee, 391 U.S. at 407, 88 S.Ct. 1705. In considering that question, the Court interpreted the phrase, “for a home, to be held by them as Indian lands are held[,]” in Article 2 of the 1854 Treaty (establishing the Menominee reservation). The case had nothing to do with tribal use-rights on land the Menominee ceded to the United States. What is clear from the Supreme Court’s opinion is that the Menominee argued that the 1854 Treaty reserved their on-reservation use rights and subsequent congressional action did not abrogate those lights. We agree with the trial court’s conclusion that the Menominee’s position in the 1968 case does not bar the Tribe’s assertions in this case.
Furthermore, the claims the Menominee presented to the Indian Claims Commission in the early 1950s do not warrant application of the judicial estoppel doctrine to this case. The issue before the Claims Commission involved compensation for land the Menominee ceded. The Menominee alleged that the United States had underpaid them for the title to their Wisconsin lands. The record does not contain any evidence revealing a claim of, or discussion about, use rights. Again, based on the record before us, it cannot be said with certainty that the parties to the Claims Commission litigation understood the Tribe’s claims to encompass use rights, as opposed to occupancy rights or title to the ceded lands.
B. Conversion of Motion to Dismiss
The Tribe asserts that the district court did not comply with the dictates of Federal Rule of Civil Procedure 12(c), which provides, in part:
If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment ... and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.
See also General Elec. Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1080 (7th Cir.1997) (“If a district court considers matters outside the pleadings, our procedural rules require that the motion shall be treated as one for summary judgment.” (internal quotation omitted)). According to the Menominee, in deciding the motion to dismiss, the court considered materials external to *456 the pleadings; namely, historical papers chronicling the treaty negotiations, an expert report, and other historical documents, such as the Tribe’s 1850 letter to the President requesting permission to remain in Wisconsin, and some mid-nineteenth centuiy reports of the Commissioner of Indian Affairs. The Menominee contend that the motion to dismiss was thus converted into a summary judgment motion, and that the court improperly decided the convei-ted motion without allowing the Tribe an opportunity to present additional evidence supporting their allegations.
We are of the opinion that the trial court’s consideration of the treaties at issue was proper. “[Djocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiffs complaint and are central to his claim.’’ Wright v. Associated Ins. Cos., 29 F.Sd 1244, 1248 (7th Cir.1994); see United States v. Wood, 925 F.2d 1580, 1582 (7th Cir.1991). Indisputably, the Menominee refer to the treaties in the complaint, and the treaties are central to the Menominee’s claims. The treaties, therefore, were not materials “outside the pleadings.”
The district court took judicial notice of the historical documents of which the Tribe complains. Menominee, 943 F.Supp. at 1004. A court may consider judicially noticed documents without converting a motion to dismiss into a motion for summary judgment. General Elec., 128 F.3d at 1080-81; Doherty v. City of Chicago, 75 F.3d 318, 324 n. 4 (7th Cir.1996); Wood, 925 F.2d at 1582. Judicial notice of historical documents, documents contained in the public record, and reports of administrative bodies is proper. Papasan v. AUain, 478 U.S. 265, 268 n. 1, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); General Elec., 128 F.3d at 1084; Henson v. CSC Cred. Sens., 29 F.3d 280, 284 (7th Cir. 1994); Mack v. South Bay Beer Distrib., 798 F.2d 1279, 1282 (9th Cir.1986) (cited with approval in Doherty, 75 F.3d at 324 n. 4). Furthermore, “a dismissal that follows from consideration of extrinsic materials may also be affirmed if ... dismissal would have been appropriate without reference to those materials.” Alioto v. Marshall Field’s & Co., 77 F.3d 934, 936 n. 3 (7th Cir.1996); see also General Elec., 128 F.3d at 1084. As explained below, the district court’s dismissal of the case was based on the clear and unambiguous language of the four treaties.
C. The Menominee Tribe’s Substantive Claims on Appeal
The Menominee present three basic claims: that the 1831 Treaty reserved their use rights on land they ceded in that Treaty; that the 1854 Treaty reserved their right to a specific proportion of the sturgeon resource; and that the Tribe retains aboriginal use rights. The district court dismissed the lawsuit after concluding that the 1848 Treaty abrogated the 1831 treaty-reserved use rights, that the court was not authorized to grant the relief requested on the sturgeon claim, and that the Tribe’s acceptance of the 1854 reservation abrogated the Menominee’s aboriginal use rights.
We review a district court’s dismissal on the pleadings de novo. Gutierrez v. Peters, 111 F.3d 1364, 1368 (7th Cir.1997); GATX Leasing Corp. v. National Union Fire Ins. Co., 64 F.3d 1112, 1114 (7th Cir.1995). Dismissal on the pleadings is proper when it appears beyond doubt that the plaintiff cannot prove any facts that would support a claim for relief. Gustafson v. Jones, 117 F.3d 1015, 1017 (7th Cir.1997); GATX Leasing, 64 F.3d at 1114. In reviewing a district court’s dismissal on the pleadings, we assume all well-pleaded facts are true and view those facts in the light most favorable to the plaintiff. Gustafson, 117 F.3d at 1017; Gutierrez, 111 F.3d at 1369.
Treaty-reserved rights (i.e., rights explicitly reserved to the Indians in a treaty) and aboriginal rights (i.e., rights arising from occupancy and use of land by the Indians from time immemorial) enjoy different levels of legal protection. See Northwestern Bands of Shoshone Indians v. United, States, 324 U.S. 335, 338-39, 65 S.Ct. 690, 89 L.Ed. 985 (1945) (distinguishing aboriginal and treaty-reserved rights); Mille Lacs Band of Chippewa, Indians v. Minnesota, 124 F.3d 904, 919 (8th Cir.1997), cert. granted, — U.S. -, 118 S.Ct. 2295, 141 L.Ed.2d 156, 1998 *457 WL 72988 (U.S. June 8, 1998) (No. 97-1337); Lac Courte Oreilks Band of Lake Superior Chippewa Indians v. Voigt, 700 F.2d 341, 351-53 (7th Cir.1983). We thus address the Menominee claims to usufructuary rights arising from the treaties of 1831 and 1854 separately from those claims based on the Tribe’s aboriginal rights.

1. Treaty Based Claims

Treaties between the United States and Indian tribes are congressional acts akin to statutes. See Ward, v. Race Horse, 163 U.S. 504, 511, 16 S.Ct. 1076, 41 L.Ed. 244 (1896) (“A treaty may supersede a prior act of congress, and an act of congress may supersede a prior treaty.”); Reich v. Great Lakes Indian Fish and Wildlife Comm’n, 4 F.3d 490, 493 (7th Cir.1993) (“Indian treaties are the legal equivalent of federal statutes.”). Treaties are also contracts subject to special rules of contract interpretation. Washington v. Washington State Commercial Passenger Fishing Vessel Ass’n, 443 U.S. 658, 675, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) (“A treaty, including one between the United States and an Indian tribe, is essentially a contract between two sovereign nations.”); Choctaw Nation v. Oklahoma, 397 U.S. 620, 630, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970) (“[T]reaties are not to be considered as exercises in ordinary conveyancing.”). Specifically, “treaties with Indians must be interpreted as they [the Indians] would have understood them, and any doubtful expression in them [the treaties] should be resolved in the Indians’ favor.” Choctaw Nation, 397 U.S. at 631, 90 S.Ct. 1328 (citations omitted); see also Oklahoma Tax Comm’n v. Chickasaw Nation, 515 U.S. 450, 465, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995) (“[Tjreaties should be construed liberally in favor of the Indians.”) (citation omitted); Oregon Dep’t of Fish and Wildlife v. Klamath Indian Tribe, 473 U.S. 753, 766, 105 S.Ct. 3420, 87 L.Ed.2d 542 (1985) (“[DJoubts concerning the meaning of a treaty with an Indian tribe should be resolved in favor of the tribe.”).
At the same time, the Supreme Court has cautioned that “even though legal ambiguities are resolved to the benefit of the Indians, courts cannot ignore plain language [contained in a treaty] that ... clearly runs counter to a tribe’s later claims.” Klamath, 473 U.S. at 774, 105 S.Ct. 3420 (citation omitted). In other words, courts cannot, “under the guise of [liberal] interpretation, ... rewrite congressional acts [i.e., treaties] so as to make them mean something they obviously were not intended to mean.” Confederated. Bands of Ute Indians v. United States, 330 U.S. 169, 179, 67 S.Ct. 650, 91 L.Ed. 823 (1947) (interpreting several treaties between the United States and the Ute Indian tribes). “Indian treaties cannot be re-written or expanded beyond their clear terms to remedy a claimed injustice.” Choctaw Nation v. United, States, 318 U.S. 423, 432, 63 S.Ct. 672, 87 L.Ed. 877 (1943).
Congress can modify and abrogate treaty-reserved rights, just like federal statutes. Menominee, 391 U.S. at 412-13, 88 S.Ct. 1705; Reich, 4 F.3d at 493. However, when Congress abrogates treaty-reserved rights the United States must compensate the tribe for the loss of those rights. Menominee, 391 U.S. at 413, 88 S.Ct. 1705. Therefore, in the context of treaty-reserved usufructuary rights, courts will not readily imply a congressional intent to repeal such rights. Id.; Reich, 4 F.3d at 493; Lac Courte Oreilks, 700 F.2d at 352 (“[AJbrogation of treaty-recognized title requires an explicit statement by Congress or, at least, it must appear clear from the circumstances and legislative history surrounding a Congressional act.”). Finally, courts must construe successive treaties in conjunction with the language of earlier treaties. See, e.g., Klamath 473 U.S. at 768, 105 S.Ct. 3420 (“The language of the [later treaty] must be read with these terms of the [earlier treaty] in mind.”); Ute Indians, 330 U.S. at 176-80, 67 S.Ct. 650 (interpreting treaty in light of language used in two earlier treaties and an earlier executive order).
The Menominee present claims based on usufructuary rights purportedly reserved in both the 1831 Treaty and the 1854 Treaty. We analyze these claims separately based on the foregoing legal principles.

*458
a. Claims based on the 1881 Treaty

The Menominee argue that the 1831 Treaty reserved their right to fish and hunt on lands ceded to the east side of the Fox River and their right to hunt on lands west of the river. The Tribe contends that the subsequent treaties did not expressly abrogate these usufructuary rights and, therefore, the Menominee retain the right to exercise these rights free from state regulation. The district court concluded that the 1848 Treaty extinguished any usufructuary rights the 1831 Treaty reserved. We agree because in the 1848 Treaty the Menominee Tribe ceded all of its rights to all of its Wisconsin land. 1848 Treaty Art. II (“The said Menomonee [sic] tribe of Indians agree to cede, and do hereby cede, sell, and relinquish to the United States all their land in the State of Wisconsin wherever situated.”).
The 1848 Treaty forecloses any claim of usufructuary rights reserved in the 1831 Treaty. In the Treaty of 1848, the Menominee Tribe unambiguously ceded all of its Wisconsin land to the United States in exchange for land located in Minnesota, and agreed to move to the new territory within two years unless the President gave the Tribe permission to remain on the ceded land. 1848 Treaty Ait. II. Clearly, by the terms of the 1848 Treaty, the Menominee relinquished title to their Wisconsin land. As the district court noted, the Menominee could not reasonably have expected to continue hunting and fishing on the land ceded in 1848, considering the Tribe had just agreed to leave the Wisconsin land and move to the Minnesota reservation approximately 300 miles away.
The Tribe attempts to avoid this conclusion by arguing that the 1848 Treaty was obtained through fraud and that the tribal signatories believed that the land cession was contingent on the aforementioned Treaty-promised exploratory trip to the Minnesota reservation. However, assuming that in 1848 the tribal signatories did not believe the Treaty was binding, by 1850, when the Tribe requested the President’s permission to extend the removal period, the Menominee certainly understood the terms of the 1848 Treaty: if in 1850 the Tribe did not believe that the 1848 Treaty was binding, why did the Tribe seek the president’s permission to remain on land in Wisconsin; if the Treaty was non-binding such permission would obviously have been unnecessary.
Moreover, although the Preamble to the 1854 Treaty suggests that the Tribe felt cheated by the 1848 Treaty, the remedy contained in the 1854 Treaty was not a repudiation or rescission of the 1848 Treaty. Rather, the 1854 Treaty unambiguously confirmed the terms of the 1848 Treaty. 1854 Treaty Preamble ¶ 1 (describing Treaty of 1854 as “supplementary” to the Treaty of 1848). By its terms, the 1854 Treaty regarded the Minnesota reservation as belonging to the Menominee and, in order to accommodate the desire of the Menominee to remain in Wisconsin, provided that the Minnesota reservation would be exchanged for a Wisconsin reservation located on the Wolf River. The 1854 Treaty thereby reinforced the terms of the 1848 Treaty.
The Tribe maintains that its refusal to remove to Minnesota demonstrates its belief that the 1848 Treaty was not binding. The Supreme Court, however, rejected a similar argument in New York Indians v. United States, 170 U.S. 1, 18 S.Ct. 531, 42 L.Ed. 927 (1898):
While it might be reasonably contended that their failure to remove should result in a cancellation of the treaty, and a restoration to them of their rights in the Wisconsin lands, that construction is precluded by the language of the [treaty], which contains a present and irrevocable grant of the Wisconsin lands, and puts it beyond their power to revoke the bargain.
Id, at 19, 18 S.Ct. 531 (construing a treaty exchanging Wisconsin land for land in Kansas which the New York tribes never occupied). The 1848 Treaty at issue in this case also contained a present and irrevocable grant of the Wisconsin lands; the Tribe’s refusal to move to Minnesota does not affect that grant in any way. See also Sokaogon Chippewa Community v. Exxon Corp., 2 F.3d 219, 222 (7th Cir.1993) (continued occupancy of ceded lands by Indians is irrelevant *459 to issue of whether Indians retain any occupancy rights in those ceded lands).
The Tribe does not challenge the fairness of the 1854 Treaty. Instead it argues that neither the 1848 Treaty nor the 1854 Treaty explicitly abrogates the usufructuary- rights allegedly reserved in the 1831 Treaty. Therefore, it contends that the usufructuary rights reserved in Article Sixth of the 1831 Treaty continue unabated. But the Tribe relinquished all its usufructuary rights in the 1848 Treaty; thus it is irrelevant that the 1854 treaty did not explicitly abrogate those rights. However, for the sake of completeness, we address the Tribe’s other arguments. The usufructuary rights on the east side of the Fox River and those on the west side of the river were reserved subject to different conditions. Therefore, we analyze the Tribe’s contentions separately as to each set of rights.
The usufructuary rights on the east side of the Fox River were reserved as follows:
The Menomonee [sic] tribe of Indians shall be at liberty to hunt and fish on the lands they have now ceded to the United States, on the east side of [the] Fox river [sic] and Green bay [sic], with the same privileges they at present enjoy, until it be surveyed and offered for sale by the President; they conduct themselves peaceably and orderly.
1831 Treaty Art. Sixth ¶ 1. Clearly, the usu-fructuary rights were conditional. Compare Ward v. Race Horse, 163 U.S. 504, 509-10, 16 S.Ct. 1076, 41 L.Ed. 244 (1896) (discussing abrogation of conditional usufructuary rights). The Menominee were free to use the land as long as they “conducted themselves peaceably and orderly,” but only until the President had the land surveyed and offered for sale. It is undisputed that the land was surveyed and offered for sale shortly thereafter in 1834. Therefore, according to the terms of the treaty, the usufructuary rights on the east side of the Fox were extinguished long before the Tribe and the United States entered into the 1848 Treaty. Because the right to hunt and fish on these lands was extinguished in 1834 through satisfaction of the conditional term (namely, the land was surveyed and offered for sale), it was unnecessary to explicitly abrogate the right to use lands east of the Fox in the 1848 Treaty, and even less reason to mention that right in the 1854 Treaty. See Klamath, 473 U.S. at 773, 105 S.Ct. 3420 (later treaty’s silence as to usufructuary rights is irrelevant when earlier treaties did not reseive such rights); Mille Lacs, 124 F.3d at 925 (distinguishing cases in which earlier treaties did not secure off-reservation usufructuary rights and those in which they did when analyzing the effect of a subsequent treaty’s silence on the issue).
The Tribe argues that the terms of the 1831 Treaty are ambiguous, and that the treaty could be understood to mean that the Menominee had the right to use whatever part of the lands east of the river that were unsold so long as they behaved “peaceably and. orderly.” The language in the 1831 Treaty simply does not support such an interpretation: it does not distinguish between land actually sold and land offered for sale. Moreover, the government’s express purpose for entering into the 1831 Treaty was to encourage the Menominee to become farmers and to use the land east of the Fox River for settlers. Allowing the Tribe to hunt on the lands that were not actually sold certainly would not have served the government’s goals of discouraging the Tribe’s pursuit of hunting and gathering food and encouraging settlement. Given this historical context, we will not ignore the plain meaning of the 1831 Treaty. See Klamath, 473 U.S. at 774, 105 S.Ct. 3420 (“[C]ourts cannot ignore plain language [in treaties] that, viewed in historical context and given a fair appraisal, clearly runs counter to a tribe’s later claims.”).
As to the land west of the Fox River, the 1831 Treaty provided the following:
[The remaining land] the Menomonees [sic] elaim as their country; that part of it adjoining the farming country,[4] on the *460 west side of the Fox river [sic], will remain to them as heretofore, for a hunting ground, until the President of the United States, shall deem it expedient to extinguish their title. In that case, the Meno-monee [sic] tribe promise to surrender it immediately, upon being notified of the desire of Government to possess it. The additional annuity then to be paid to the Menomonee [sic] tribe, to be fixed by the President.
1831 Treaty Ait. Sixth ¶ 2. Although in general usufructuary rights are not dependant on having title to the land, see, e.g., Sokaogon Chippewa Community, 2 F.3d at 223, here the 1831 Treaty explicitly links the right to hunt on the land to having title to the land: the Treaty states that the Tribe’s right to hunt on the land remained until the President extinguished their title to the land. The Treaties of 1836 and 1848, in which the Menominee ceded title to those lands, thus extinguished their right to use the land for hunting. Again, it was unnecessary to mention the usufructuary rights in the 1854 Treaty.
The Tribe attempts to analogize the 1831 Treaty condition, “until the President ... shall deem it expedient,” to the treaty language at issue in Lac Comte Oreilles Band of Lake Superior Chippewa, Indians v. Vo igt, 700 F.2d 341 (7th Cir.1983), in order to support its assertion of continuing usufructuary rights on the west side of the Fox River. In Lac Courte Oreilles, this court analyzed a treaty reserving usufructuary rights “during the pleasure of the President.” Id. at 345. We held that this language did not give the President unlimited power to revoke the right to use the land. Rather, we opined that the Indians reasonably understood the treaty to mean that they could use the land so long as their coexistence with the white settlers was peaceful. Id, at 356-57. In other words, we interpreted the treaty to mean that the President would be pleased as long as the Indians lived peacefully with the settlers, and that the Indians thus had the right to use the land for as long as they remained peaceful.
Our holding in Lac Comte Oreille,s is not relevant to the question presented here. In Lac Courte Oreilles, the determinative issue was how to interpret the phrase “the pleasure of the President.” In this case we are not set the task of analyzing the meaning of “until the President of the United States shall deem it expedient.” Instead, the question is whether the terms of the treaty inextricably joined the Tribe’s usufructuary rights to the Tribe’s title to the land, and thus whether those usufructuary rights were extinguished when the Tribe ceded its title to the land. For purposes of this analysis, the Tribe’s understanding of “expedient” is irrelevant.
The Menominee also assert that they ceded the land west of the Fox under the assumption that title to the land would revert to their possession if the New York tribes chose not to settle there. But the treaty explicitly states that if the New York tribes did not relocate to Wisconsin, “such portion [of land] as would have belonged to said [New York] Indians shall revert to the United States. That portion, if any, so reverting, to be laid off by the President.” 1831 Treaty Art. First. The Tribe’s alleged expectation that they would keep the land if the New York tribes did not take it runs counter to the express language of the treaty. We will not interpret a treaty to mean the opposite of what it says. See Klamath, 473 U.S. at 774, 105 S.Ct. 3420 (“[C]ourts cannot ignore plain [treaty] language that ... clearly runs counter to a tribe’s later claims."). We disagree and hold that the Tribe’s claim on this issue is based on a foundation of legal quicksand.
We conclude that the Tribe can prove no set of facts which would entitle them to exercise usufructuary activities on lands off of the reservation under the 1831 Treaty. Thus, the district court correctly dismissed the Menominee’s claims to continuing off- *461 reservation, treaty-reserved usufructuary rights.

b. Claim based an the 185⅛ Treaty

The Menominee also claim the right to fish for sturgeon off of the reservation because manmade dams are preventing tribal members from exercising their 1854 Treaty right to catch sturgeon on the reservation. Purportedly, the 1854 Treaty reserved 50% of the sturgeon resource exclusively for the use of the Menominee, and now, because the dam prevents 50% of the sturgeon from reaching the reservation, the Tribe wants equitable relief in the form of a declaration of off-reservation fishing rights. Because the terms of the 1854 Treaty do not expressly entitle the Tribe to a specific proportion of sturgeon, the Menominee are not entitled to relief on this claim. Indeed, Article 2 of the 1854 Treaty, which established the Wolf River Reservation, does not explicitly mention either fishing or sturgeon:
In consideration of the foregoing cession the United States agree to give, and do hereby give, to said Indians for a home, to be held as Indian lands are held, that track of country lying upon the Wolf River, in the State of Wisconsin ... [describing the boundary of the Wold River Reservation],
The treaty does not guarantee any amount or quantity of sturgeon to the Tribe and we must interpret a treaty as a contract.
In each of the cases the Tribe cites in support of this claim, the treaty at issue explicitly secured off-reservation fishing rights to the Indians. See Washington, 443 U.S. at 661, 99 S.Ct. 3055 (treaty guaranteeing the “right of taking fish ... in common with all citizens of the Territory.”); Puyallup v. Department of Game of State of Washington, 433 U.S. 165, 177 n. 16, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977) (“The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all cit izens of the Territory.”); United States v. Winans, 198 U.S. 371, 378, 25 S.Ct. 662, 49 L.Ed. 1089 (1905) (treaty securing “the right of taking fish at all usual and accustomed places, in common with citizens of the. territory.”). Additionally, the treaties at issue in Washington, Pu-yallup, and Winans expressly provided that the tribal off-reservation fishing rights would be shared with non-treaty, or non-Indian, fishermen. In other words, the tribes in Washington, Puyallup and Winans had a “textual handle”, or specific treaty language, see. Sokaogon Chippewa Community, 2 F.3d at 223, supporting their claims to a specific proportion of fish. The Menominee Tribe, on the other hand, has not pointed to any language in the treaties supporting its claim to a specific proportion of the sturgeon catch.
The Tribe attempts to develop such a textual handle by reference to the Supreme Court’s Menominee decision. 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968). The Menominee contend that the Supreme Court, by recognizing the 1854 Treaty’s silenee on hunting and fishing rights but interpreting the Treaty as reserving such rights, essentially re-wrote the Treaty to explicitly reserve fishing rights to the Tribe. This argument is problematic for several reasons. First, the Supreme Court did not re-write the treaty; rather, the Court interpreted ambiguous treaty language. Id. at 405-06, 88 S.Ct. 1705 (interpreting “for a home, to be held as Indian lands are held.”). Here, the treaty (contract) is not ambiguous. The language is clear and not subject to the interpretation offered by the Tribe. Moreover, the Supreme Court was not interpreting the 1854 Treaty in the context of allocating usu-fructuary resources between the Indians and non-Indians. Compare Washington, 443 U.S. at 684-85, 99 S.Ct. 3055 (“Both sides [i.e., Indians and non-Indians] have a right, secured by treaty, to take a fail- share of the available fish.”). A declaration of on-reservation fishing rights is not equivalent to a right to some proportion of the sturgeon catch. In this case, it is not possible to interpret “as Indian lands are held” as a reservation of a specific proportion of the sturgeon catch as against non-Indian fishers.
Furthermore, the Menominee decision involved on^reservation usufructuary rights, while here, the Menominee seek a declaration of off-reservation rights. This distinction differentiates the Tribe’s claims from those of other Indians, which rely on treaties securing off-reservation usufructuary rights. *462 For instance, in Winans, the Court declared an easement on privately held lands for the Indians to enforce a treaty securing off-reservation fishing rights. 198 U.S. at 382; see also Washington, 443 U.S. at 685-86, 99 S.Ct. 3055 (affirming district court’s allocation of certain percentage of harvestable portion of fish in order to secure treaty right to take fish in common with others at all usual and accustomed places). As discussed in a prior section of this opinion, the Menominee did not reserve off-reservation usufructuary rights in any of the earlier treaties, and the 1854 Treaty is silent on the issue. We are unaware of any Supreme Court decision authorizing a declaration of off-reservation fishing rights to remedy the inability to exercise a claimed “right” not even mentioned in a treaty. As stated in Choctaw Nation, “Indian treaties cannot be re-written or expanded beyond their clear terms to remedy a claimed injustice.” 330 U.S. at 179, 67 S.Ct. 650.
The Menominee can prove no set of facts entitling them to a declaration of off-reservation fishing rights based on the 1854 treaty. Therefore, the district court correctly dismissed the Tribe’s sturgeon claims.

2. Claims Based on Aboriginal Possession and Use of Lands

The Tribe asserts a continuing right to fish in Lake Winnebago, Lake Michigan, and the Wisconsin River. The Menominee contend that, because they have used the resources of these waters from time immemorial and because none of the treaties expressly extinguished their aboriginal rights or fishing rights in those waters, the Tribe retains its aboriginal right to use those bodies of water free from state regulation. We disagree.
“Extinguishment of Indian title based on aboriginal possession .... [can] be done by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise, [and] its justness is not open to inquiry in the courts.” United States v. Santa Fe Pacific R.R. Co., 314 U.S. 339, 347, 62 S.Ct. 248, 86 L.Ed. 260 (1941). Abrogation of aboriginal title occurs “without any legal responsibility in the sovereign [United States] to compensate the Indian for his loss.” Northwestern Bands of Shoshone Indians, 324 U.S. at 339, 65 S.Ct. 690; see also Lac Courte Oreilles, 700 F.2d at 351 (citing Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 288-89, 75 S.Ct. 313, 99 L.Ed. 314 (1955)). Furthermore, the creation and acceptance of an Indian reservation by treaty constitutes a relinquishment of aboriginal rights to lands outside the reservation. Santa Fe Pacific R.R., 314 U.S. at 357-58, 62 S.Ct. 248; Lac Courte Oreilles, 700 F.2d at 352. The Tribe signed the 1854 Treaty which created the Wolf River reservation and extinguished any aboriginal rights the Menominee possessed, including aboriginal rights in land or water not specifically mentioned in any treaty. It is irrelevant whether members of the Tribe continued to use these off-reservation resources. Santa Fe Pacific R.R., 314 U.S. at 357, 62 S.Ct. 248. Because the Menominee can prove no set of facts under which they would be entitled to exercise aboriginal rights, this claim was properly dismissed as well.
III. CONCLUSION
The decision of the district court is Affirmed.

. For instance, the government agreed to: employ five farmers for ten years to teach tribe members how to cultivate their land; employ five women For ten years to instruct Menominee women "in the business of useful housewifery;” build and pay up to $13,000 for permanent houses for tribe members; supply $6,000 for the purchase of farm animals; erect a grist mill and employ a miller; provide and distribute clothing worth $8,000; establish a blacksmith and provide iron and steel for the smith; and to educate Menominee children. 1831 Treaty Arts. Fouith and Fifth.

. The treaty does not explicitly locate the land in Minnesota because Minnesota had yet to be admitted to the Union. Rather, the Treaty describes the land as:
all that country or tract of land ceded to the said United States by the Chippewa Indians of the Mississippi and Lake Superior, in the treaty of August 2, 1847, and the Pillager band of Chippewa Indians in the treaty of August 21, 1847, which may not have been assigned to the Winnebago Indians, under the treaty with that tribe of October 13, 1846, and which is guarantied [sic] to contain not less than six hundred thousand acres.
1848 Treaty Art. III.

. The phrase “removal treaty” refers to a treaty in which an Indian tribe agrees to leave its traditional lands and move to lands with which the tribe has no traditional ties.

. The “farming country” refers to a specific part of the reservation which the Indians agreed to use for agricultural purposes. In 1831, the Menominee were somewhat nomadic hunter-gatherers; the government wanted to encourage farming among the Menominee, thereby eliminating *460 the necessity to roam over millions of acres, that were claimed by the Tribe, in search of food. See 1831 Treaty Art. Fourth ("The following described tract of land ... shall be set apart, and designated for their future homes upon which improvements as an agricultural people are to be made.... The above reservation being made to the Menomonee [sic] Indians for the purpose of weaning them from their wandering habits, by attaching them to comfortable homes.”).