**STEWART TITLE GUARANTY COMPANY, Plaintiffs,**

v.

**RESIDENTIAL TITLE SERVICES, INC., and Maxum Indemnity Company, Defendants.**

**Residential Title Services, Inc., Third–Party Plaintiff,**

v.

**Misook Choi Kim a/k/a Jennifer Mi Sook Kim, Third–Party Defendant.**

**Case No. 05C1197.**

United States District Court, E.D. Wisconsin.

March 27, 2009.

Leon W. Todd, Thomas L. Shriner, Jr., Laura Schulteis Kwaterski, Foley & Lardner LLP, Milwaukee, WI, for Plaintiffs.

James V. Noonan, Mitchell A. Lieberman, Ralph T. Wutscher, Patrick J. McCann, II, Noonan & Lieberman Ltd., Chicago, IL, for Defendant Residential Title Services, Inc.

## DECISION AND ORDER

LYNN ADELMAN, District Judge.

Plaintiff Stewart Title Guaranty Company ("Stewart") brings this breach of contract action against defendants Residential Title Services, Inc. ("Residential"), and Maxum Indemnity Company ("Maxum"). I have diversity jurisdiction.[1] Before me now is Stewart's motion for summary judgment.

## I. STANDARD OF REVIEW

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis omitted). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." Id. For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." Id. In evaluating a motion for summary judg-

ment, I draw all inferences in a light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, I am is "not required to draw every conceivable inference from the record-only those inferences that are reasonable." Bank Leumi Le–Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir.1991). In evaluating a summary judgment motion, I may consider only evidence that is admissible at trial. Sokaogon Chippewa Cmty. v. Exxon Corp., 2 F.3d 219, 224–25 (7th Cir.1993).

In the present case, defendants raise several affirmative defenses. Defendants bear the burden of proving affirmative defenses at trial. See, e.g., Lobermeier v. Gen. Tel. Co. of Wis., 119 Wis.2d 129, 148, 349 N.W.2d 466 (1984); Christensen v. Equity Coop. Livestock Sale Ass'n, 134 Wis.2d 300, 303, 396 N.W.2d 762 (Ct.App. 1986); Advance Pipe & Supply Co. v. Wis. Dep't of Revenue, 128 Wis.2d 431, 439, 383 N.W.2d 502 (Ct.App.1986). Thus, to defeat Stewart's summary judgment motion, defendants must make a showing sufficient to establish the existence of the elements essential to such affirmative defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This is so because one of the principal purposes of the summary judgment procedure is to isolate and dispose of claims and defenses lacking factual support. Id. at 323–24, 106 S.Ct. 2548.

Neither Stewart nor either defendant has requested a jury trial, and the time for making such a request has expired. Thus, if a trial is required, it will be a bench trial. Rule 56 makes no explicit distinction be-

---

1. Stewart is a Texas corporation, and its principal place of business is Texas. Residential is an Illinois corporation, and its principal place of business is Illinois. Maxum, Residential's insurer, is a Delaware corporation, and its principal place of business is Georgia. Stewart joins Maxum as a defendant under Wis. Stat. § 803.04(2), Wisconsin's direct action statute.

tween jury and bench trials. However, the rule is designed as a pretrial mechanism for "asses[ing] the proof in order to see whether there is a genuine need for trial," and whether there is such a need may depend on whether trial would be to the court or to a jury. William Schwarzer, Alan Hirsch & David Barrans, *The Analysis & Decision of Summary Judgment Motions,* 139 F.R.D. 441, 474 (1991) (quoting Fed.R.Civ.P. 56(e) advisory committee's notes (amended 1963)). When evidentiary facts are in dispute, when the credibility of witnesses may be in issue or when conflicting evidence must be weighed, a full trial is necessary regardless of whether it is a bench or a jury trial. *Id.* But when the question for decision involves drawing inferences from undisputed evidence, or interpreting and evaluating evidence to derive legal conclusions, a trial may not add to the judge's ability to decide. Thus, when the disputed issue is one of ultimate fact, a bench trial is often unnecessary; the considerations that militate in favor of a jury trial do not apply. *Id.*; *see also Cent. States S.E. & S.W. Areas Pension Fund v. Slotky,* 956 F.2d 1369, 1374 (7th Cir.1992) (stating that where the factual issues involve characterization, and the opponent of summary judgment has no right to a jury trial, a formally "factual" issue may be resolved on summary judgment).

In the present case, there are no disputed lay facts and no issues of witness credibility. The question for decision involves the evaluation of and drawing of inferences from undisputed evidence.

## II. FACTS

In 2002, Misook Choi Kim ("Kim") sought a $200,000 loan from BNC Mortgage, Inc., ("BNC"), which she asserted would be secured by a mortgage on residential property in Caledonia, Wisconsin. BNC agreed to the loan and in turn, sought a title insurance policy from Stewart for the purpose of protecting its interest in the Kim property. In 1998, Stewart entered into an underwriting agreement with Residential ("the Agreement"), authorizing Residential to issue title insurance policies in Stewart's name.

The Kim/BNC transaction was scheduled to close on November 27, 2002. On about November 8, 2002, Residential conducted a title search with respect to the Kim property. The effective date of such search was October 22, 2002.[2] In the second or third week of November, Residential updated the search. The effective date of the updated search was November 1, 2002. On November 5, 2002, Countrywide Home Loans, Inc. ("Countrywide") recorded a mortgage in the amount of $175,000 on the Kim property in the Register's office. Subsequently, the closing date of the Kim/BNC transaction was postponed and rescheduled for December 26, 2002. Residential did not further update its search. On December 26, the Kim/BNC mortgage closed, and Residential served as the closing agent. On January 15, 2003, Residential issued a title insurance policy to BNC in the amount of $200,000, insuring BNC in the event that its mortgage on the Kim property did not have priority over any other encumbrance.

**2.** The effective date of a title search is the date on which documents concerning the property that is the subject of the search become accessible to the public. Because of the need for staff to process filed documents, there is a lag time between the date a document is recorded in the office of the Register of Deeds ("Regis-

ter") and the date that the document becomes accessible to the public. The evidence in the present case indicates that the lag time between a title search in the Register's office and the effective date of the search is somewhere between one and two and half to three weeks.

In December 2004, Countrywide instituted a foreclosure action on the Kim property. As the first recorded mortgage, Countrywide's mortgage had priority over BNC's. In order to place BNC in the first lien position insured by the title policy, Stewart paid Countrywide $194,508.42.

I will state additional facts in the course of this decision.

## III. DISCUSSION

■ In a diversity case, I apply state substantive law including choice of law rules. *Wood v. Mid–Valley, Inc.*, 942 F.2d 425, 426 (7th Cir.1991). I apply the law of the forum state unless the parties point to an outcome-determinative conflict among potentially applicable state laws. *See id.* at 426–27. In the present case, the parties point to no such conflict. Thus, I apply Wisconsin law. I resolve the matter as I believe the Wisconsin Supreme court would. *Baltzell v. R & R Trucking Co.*, 554 F.3d 1124, 1130 (7th Cir.2009). If there is no prevailing authority from that court, I give great weight to the holdings of the Wisconsin appellate courts. *Id.*

■ In interpreting the Agreement, I give effect to the parties' intentions, *Johnson Controls, Inc. v. Employers Ins. of Wausau*, 264 Wis.2d 60, 85, 665 N.W.2d 257 (2003), and I ascertain those intentions by looking at the language of the contract. *State ex rel. Journal/Sentinel, Inc. v. Pleva*, 155 Wis.2d 704, 711, 456 N.W.2d 359 (1990). I interpret the language as a reasonable person would. *Danbeck v. Am. Family Mut. Ins. Co.*, 245 Wis.2d 186, 193, 629 N.W.2d 150 (2001). If the language is unambiguous, I merely apply it. *State v. Peppertree Resort Villas, Inc.*, 257 Wis.2d 421, 432, 651 N.W.2d 345 (Ct.App.2002). If the language is ambiguous, I may consider extrinsic evidence to ascertain its meaning. *Id.* at 432–33, 651 N.W.2d 345.

The Agreement requires Residential to "issue title policies according to recognized underwriting practices [and] the rules and instructions given by [Stewart]. . . ." (Decl. of David J. Silberman Ex. A at 2.) It provides that "[e]ach title policy shall . . . correctly reflect the status of title as of the date and time of said policy with appropriate exceptions as to liens, defects, encumbrances, and/or objections disclosed by the search and examination of title. . . ." *Id.* It states that Residential shall not "insure over a title defect, lien, or encumbrance" without plaintiff's written consent, *id.* at 3, and that

> [o]n each loss . . . due to the negligence [of Residential], Residential shall be liable to [Stewart] for the entire amount of such loss. . . . Such losses include but are not limited to:
>
> . . . .
>
> (2) Failure to discover or report any instrument of record affecting title.
>
> . . . .
>
> (4) Failure to follow underwriting guidelines and/or instructions of [plaintiff].
>
> (5) Failure to prepare a title policy which shows defects and matters affecting title disclosed in the title search or which should have been disclosed in the title search.

*Id.* at 4.

■ The Agreement does not define "negligence." However, under Wisconsin law, a plaintiff can recover damages for a defendant's negligence where there is (1) a duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the injury; and (4) an actual loss as a result of the injury. *Transp. Ins. Co. v. Hunzinger Const. Co.*, 179 Wis.2d 281, 293, 507 N.W.2d 136 (Ct.App.1993). When determining the standard of care owed by a defendant to a plaintiff, a Wisconsin court may consider the practice in the

industry in which the defendant is engaged. *Kalkopf v. Donald Sales & Mfg. Co.*, 33 Wis.2d 247, 252–53, 147 N.W.2d 277 (1967). The parties agree that under the Agreement, Residential owed Stewart a duty of reasonable care. The issues presented are whether Residential breached such duty and, if so, whether such breach caused Stewart to incur a loss.

■ Stewart argues that Residential was negligent within the meaning of the Agreement by failing to update its title search concerning the Kim property closer to the December 26, 2002 closing. Stewart further contends that if Residential had conducted such an update, it would have discovered Countrywide's lien and thus not insured BNC's mortgage as a first lien. In support of its contention that Residential's duty of care obliged it to update its search concerning the Kim property closer to the December 26, 2002 closing, Stewart points to several pieces of evidence. First, it presents the testimony of Stewart vice-president David Silberman. Silberman states that he has worked in the title insurance industry for thirty-six years and that he is knowledgeable concerning practice in the industry with respect to title searches. He states that where, as here, an agent acts as a closing agent with respect to the closing of a mortgage loan (in addition to acting as an agent for an insurer issuing a title insurance policy), the agent must conduct an initial title search and update the search no more than a few days before the closing. Silberman states that the update is necessary to maximize the likelihood of discovering all encumbrances on the title prior to the closing and to minimize the possibility of failing to discover an encumbrance recorded after the initial title search. He states that an agent who fails to conduct such an update fails to exercise ordinary care under the circumstances.

Stewart also cites the testimony of its claims counsel, Sara Bergman Cavil. Cavil testifies that the practice in the title insurance industry is for an agent such as Residential to update the title search a few days before the closing. Stewart also cites the testimony of Stephanie L. Hawley, Residential's Wisconsin operations manager. Hawley testifies that for a mortgage closed on December 26, 2002, industry practice would be to conduct an updated search after December 12, 2002.

Defendants present no admissible evidence contradicting the testimony of Silberman, Cavil and Hawley. They offer the affidavit of Residential regional vice-president, Anthony J. Krolak. However, defendants failed to identify Krolak as a witness pursuant to Fed.R.Civ.P. 26(a). Thus, Stewart was unable to depose him. Therefore, pursuant to Fed.R.Civ.P. 37(c)(1), I will not consider his affidavit. Even if I did consider Krolak's testimony, he agrees that an "updated title search is ideally performed as close as possible to the closing date," adding only that "there is no set and established criteria identifying the minimum number of days in which an updated title search must be conducted before closing." (Krolak Aff. ¶ 12.) Defendants also offer the testimony of Residential vice-president Anthony Scaffido, who states that he is unaware of what other title companies do but that Residential's practice is to schedule an updated search when a closing is scheduled. He does not indicate that Stewart was aware of Residential's practice.

Based on the evidence in the record, I conclude that there is no genuine issue of material fact that the practice in the title insurance industry is that agents update title searches within several days of the closing or, in any case, as close to the closing as possible. The reason for such practice is that it maximizes the likelihood that the agent will discover whether the

title in question is encumbered. As previously indicated, industry practice is relevant to the standard of care a defendant in the industry owes a plaintiff. Thus, I further conclude that there is no genuine issue of material fact that Residential had a duty to Stewart to update its search concerning the Kim property within a few days of the December 26, 2002 closing or, if circumstances preventing it from doing so, as close to December 26 as possible. Additionally, I conclude that there is no genuine issue of material fact that in the present case, Residential breached such duty. It is undisputed that at no time prior to the December 26, 2002 closing did Residential update the search which it conducted in the second or third week of November 2002. Thus, Residential not only failed to conduct an updated search within a few days of the December 26 closing, it allowed between four and six weeks to elapse between its most recent update and the closing. Residential presents no reason why it could not have conducted an update close to the closing date. Even assuming that it did not receive notice of the closing until shortly before it was scheduled to take place, Residential could easily have dispatched a title searcher to the Racine County Courthouse, in which the Register's office is located. Residential employee, Kathy Reck, testifies that she conducted searches in the Racine County Courthouse approximately twice a week.

Moreover, even if I assume that Residential's duty of care to Stewart required it to do nothing more than follow its own practice—conduct an update upon the scheduling of a closing—there is no genuine issue of material fact that Residential breached such duty. No reasonable factfinder could conclude that Residential conducted an update after the December 26 closing was scheduled. Although the record does not disclose when the December 26 closing was scheduled, the update Residential conducted in the second or third week of November was almost certainly done in contemplation of the originally scheduled closing which was to occur on November 27. Thus, there is no genuine issue of material fact that by failing to conduct a timely update relative to the December 26 closing, Residential was negligent within the meaning of the Agreement.

In order to recover from Residential under the Agreement, Stewart must establish not only that Residential was negligent but that it suffered a "loss due to" such negligence. Thus, I turn to the issue of causation. I conclude that there is no genuine issue of material fact that Residential's negligence caused Stewart to incur a loss. Stewart presents evidence based on sampling indicating that an update conducted as early as December 12, 2002—two weeks before the closing—would have uncovered the Countrywide lien. Nothing in the record contradicts such evidence. Thus, if Residential had conducted an update within several days of the closing, it would have discovered the Countrywide lien.

Actually, the evidence is even more favorable to Stewart than its sampling suggests. The evidence indicates that Countrywide recorded its lien on November 5, 2002. The evidence further indicates that the time lag between a title search and the effective date of such search was between one week and two and a half to three weeks. Thus, assuming a lag of three weeks, an update conducted anytime after November 26, 2002 would have discovered the Countrywide encumbrance. Thus, a reasonable factfinder could only conclude that Residential's failure to conduct a timely update of its search concerning the Kim property caused its failure to discover the Countrywide lien.

There is also no genuine issue of material fact that if Residential had discovered

the Countrywide lien prior to the Kim/BNC closing, Stewart could have avoided the loss it suffered as a result of issuing a title policy incorrectly indicating that BNC had a priority lien on the Kim property. Had it known of the Countrywide lien, Stewart could have avoided closing BNC's mortgage and avoided issuing a policy that did not reflect the correct status of BNC's title. Thus, there is no genuine issue of material fact that Stewart's loss was "due to" Residential's negligence within the meaning of the Agreement.

■■■ I turn next to defendants' affirmative defenses. First, defendants argue that Stewart failed to mitigate its damages by not bringing a fraud claim against Kim. In a breach of contract case, a defendant must take reasonable steps to mitigate its damages. *Land O'Lakes, Inc. v. Superior Serv. Transp. of Wis., Inc.*, 500 F.Supp.2d 1150, 1156 (E.D.Wis.2007); *Kuhlman, Inc. v. G. Heileman Brewing Co.*, 83 Wis.2d 749, 752, 266 N.W.2d 382 (1978). However, defendants present no evidence with respect to Stewart's alleged failure to mitigate. Further, nothing in the record indicates that Stewart would have recovered anything by suing Kim. Thus, no reasonable factfinder could conclude that by not pursuing Kim, Stewart failed to take reasonable steps to mitigate its damages.

■■■ Second, defendants contend that Stewart's loss was caused by Kim's conduct rather than Residential's. However, defendants present no evidence in support of this defense. In addition, they develop no arguments supporting it. Arguments not developed in a meaningful way are waived. *Cent. States S.E. & S.W. Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 808 (7th Cir.1999). Thus, this defense also fails.

■■■ Third, defendants contend that Stewart waived its right to pursue a claim against Residential because on several occasions during telephone conversations, Stewart employee Sara Bergman Cavil indicated to Residential employee Stephanie L. Hawley that Residential had nothing to worry about because the case involved fraud on the part of the borrower. Defendants cite no case from Wisconsin or any other jurisdiction supporting their contention that Cavil's conversations with Hawley amounted to a waiver by Stewart of its right to enforce the Agreement. Again, defendants do not meaningfully develop their argument. Thus, they waive it. *Id.* The argument also fails on the merits. First, defendants present no evidence indicating that Cavil had authority, real or apparent, to waive Stewart's right to enforce the Agreement. Stewart is a national corporation and Cavil a staff lawyer in Wisconsin. Second, it is highly unlikely that the Wisconsin Supreme Court would hold that a defendant, which has already breached a contract, can avoid responsibility for the breach by claiming that the plaintiff waived enforcement of the contract without requiring the defendant to show that the alleged waiver was in writing, supported by consideration or that it produced detrimental reliance. *See Bank v. Truck Ins. Exchange*, 51 F.3d 736, 739 (7th Cir.1995). In fact, in contractual settings, courts frequently limit waiver to minor conditions. 2 E. Allan Farnsworth, *Contracts* § 8.5, at 378–79 (2d ed. 1990). Third, the evidence does not support the proposition that Stewart waived its right to enforce the Agreement. This is so because on June 8, 2005 and again on August 8, 2005, roughly contemporaneous with the Cavil/Hawley conversations, Stewart sent letters to Residential formally notifying it of Stewart's claim.

Finally, defendants assert the affirmative defense of estoppel. In order to establish estoppel, defendants must show an action or nonaction by Stewart on which they relied to their detriment. *Riccitelli v. Broekhuizen*, 227 Wis.2d 100, 113, 595 N.W.2d 392 (1999). Defendants neither

develop an argument nor present evidence with respect to this defense. Thus, it fails as well.

## IV. CONCLUSION

Thus, for the reasons stated, I conclude that Stewart is entitled to summary judgment. Finally, Stewart presents evidence that it suffered damages in the amount of $194,508.42, which is the total amount paid to Countrywide, including Countrywide's attorney's fees and costs in handling the payoff. Stewart is entitled to these damages under paragraph five of the Agreement, and Residential has not disputed the amount.

Therefore,

**IT IS ORDERED** that plaintiff's motion for summary judgment is **GRANTED.**